David E. Stanley (SBN 144025)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: (213) 457-8000
Facsimile: (213) 457-8080
dstanley@reedsmith.com

Michael X. Imbroscio (pro hac vice)
Phyllis A. Jones (pro hac vice)
Kathleen E. Paley (pro hac vice)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5868
Facsimile: (202) 778-5868
mimbroscio@cov.com
pajones@cov.com
kpaley@cov.com

Attorneys for Defendant
Eli Lilly and Company

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN HEXUM AND NICK HEXUM,<br><br>Plaintiffs,<br><br>vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>Defendant. | No.: 2:13-cv-2701 SVW-MANx<br><br>**LILLY'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LOUIS MORRIS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: April 6, 2015<br>Time: 1:30 PM<br>Location: Courtroom 6<br>Judge: Hon. Stephen V. Wilson |

**NOTICE OF MOTION**

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 6, 2015, at 1:30 P.M. or as soon thereafter as the matter may be heard in Courtroom 6 of the United States District Court, Central District of California, Western District, located at 312 N. Spring Street, Los Angeles, California 90012, defendant Eli Lilly and Company will move the Court to exclude the proposed expert testimony of Louis Morris, proffered by Plaintiffs Erin Hexum and Nick Hexum, under Federal Rules of Evidence 702 and 403.

The Motion will be based on this Notice of Motion and Motion, the Memorandum of Points and Authorities set forth below, and the Declaration of Kathleen E. Paley.

This motion is made following a conference of counsel pursuant to L.R. 7-3, which took place on February 25, 2015.


DATED:      March 4, 2015           Respectfully Submitted,

                                    /s/ David E. Stanley
                                    David E. Stanley
                                    REED SMITH LLP

                                    Michael X. Imbroscio (*pro hac vice*)
                                    Phyllis A. Jones (*pro hac vice*)
                                    Kathleen E. Paley (*pro hac vice*)
                                    COVINGTON & BURLING LLP

                                    Attorneys for Defendant
                                    ELI LILLY AND COMPANY

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

BACKGROUND ............................................................................................. 2

APPLICABLE LEGAL STANDARDS ................................................................. 6

ARGUMENT ................................................................................................. 8

I.     Dr. Morris's Opinion That Physicians Would Misread the Cymbalta Label's Discussion of Discontinuation Symptoms Is Unreliable and Unhelpful .......... 8

    A.     Dr. Morris's Opinion Is Conclusory and Unsupported by Any Reliable Methodology ................................................................... 8

    B.     Dr. Morris Neglected to Support His Opinion With Social Scientific Tools or Empirical Evidence ................................................. 11

    C.     Dr. Morris Neglected to Employ in his Report the Same Level of Intellectual Rigor That Characterizes Work in the Field ..................... 13

    D.     Dr. Morris's Experience Is Not Sufficiently Linked to His Opinion or Sufficiently Relevant to Render It Admissible ................................ 15

    E.     Dr. Morris Formed His Opinion for This Litigation ............................ 17

    F.     Dr. Morris's Opinion Is Unhelpful to the Jury ................................. 19

    G.     McDowell Illustrates the Unreliability and Irrelevance of Dr. Morris's Opinion on the Cymbalta Label. .......................................... 19

II.    Dr. Morris's Opinions That Repeat the Conclusions of Others Are Unreliable and Unhelpful ................................................................................... 20

    A.     Dr. Morris Unreliably and Unhelpfully Parrots ISMP's Findings........ 20

    B.     Dr. Morris Quotes the Cymbalta Label and Repeats Dr. Glenumullen's Findings Without Any Analysis ............................................... 22

III.   Dr. Morris's Opinions on the EU Cymbalta Label Are Irrelevant ................ 22

CONCLUSION ............................................................................................. 25

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Apollo Grp. Inc. Sec. Litig.*,
  527 F. Supp. 2d 957 (D. Ariz. 2007) ................................................................ 16

*Estate of Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014) ............................................................................ 6

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
  524 F. Supp. 2d 1166 (N.D. Cal. 2007)................................................ *passim*

*Bickel v. Pfizer, Inc.*,
  431 F. Supp. 2d 918 (N.D. Ind. 2006) ...................................................... 12, 13

*Cabrera v. Cordis Corp.*,
  134 F.3d 1418 (9th Cir. 1998) .......................................................................... 7

*Calisi v. Abbott Laboratories*,
  2013 WL 5441355 (D. Mass. Sept. 27, 2013)............................................ 12, 13

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012)...................................................................... 19

*Cloud v. Pfizer Inc.*,
  198 F. Supp. 2d 1118 (D. Ariz. 2001) ......................................................... 7, 23

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)........................................................................................... 6

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ..................................................................... *passim*

*Dewick v. Maytag Corp.*,
  324 F. Supp. 2d 894 (N.D. Ill. 2004)............................................................... 13

*Diviero v. Uniroyal Goodrich Tire Co.*,
  919 F. Supp. 1353 (D. Ariz. 1996), *aff'd*, 114 F.3d 851 (9th Cir. 1997) ............ 16

*Durkin v. Equifax Check Servs., Inc.*,
  406 F.3d 410 (7th Cir. 2005) ........................................................................... 11

*Fidelity Nat. Fin., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*,
  2014 WL 1286392 (S.D. Cal. Mar. 28, 2014)............................................. 13, 14

*Harrison v. Wyeth Labs.*,
  510 F. Supp. 1 (E.D. Pa. 1980), *aff'd*, 676 F.2d 685 (3d Cir. 1982)................... 24

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Hickman v. Sofamor-Danek Grp., Inc.*,
  1999 WL 606690 (N.D. Cal. Feb. 17, 1999) ....................................................... 17

*IGT v. Alliance Gaming Corp.*,
  2008 WL 7084606 (D. Nev. Oct. 21, 2008) ................................................. *passim*

*Kaufman v. Pfizer Pharms., Inc.*,
  2011 WL 7659333 (S.D. Fla. Aug. 4, 2011) ................................................. 15, 16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................................. 6, 7, 13

*Lofton v. McNeil Consumer & Specialty Pharms.*,
  2008 WL 4878066 (N.D. Tex. July 25, 2008), *aff'd*, 682 F. Supp. 2d
  662 (N.D. Tex. 2010), *aff'd*, 672 F.3d 372 (5th Cir. 2012) .................................. 23

*Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996) ........................................................................ 17

*McDowell v. Eli Lilly & Co.*,
  --- F. Supp. 3d. ---, 2014 WL 5801604 (S.D.N.Y. Nov. 7, 2014)........... 10, 19, 22

*McDowell v. Eli Lilly & Co.*,
  2015 WL 845720 (S.D.N.Y. Feb. 26, 2015) ........................................... 19, 20, 22

*Meridia Prods. Liab. Litig. v. Abbott Labs.*,
  447 F.3d 861 (6th Cir. 2006) ........................................................................ 23

*Motus v. Pfizer Inc.*,
  196 F. Supp. 2d 984 (C.D. Cal. 2001), *aff'd*, 358 F.3d 659 (9th Cir.
  2004) ........................................................................................................... 8

*In re Nexium (Esomeprazole) Prods. Liab. Litig.*,
  2014 WL 5313871 (C.D. Cal. Sept. 30, 2014) ...................................................... 7

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................. 17, 20, 21, 22

*In re Seroquel Prods. Liab. Litig.*,
  2009 WL 3806436 (M.D. Fla. July 20, 2009) ...................................................... 17

*In re Seroquel Prods. Liab. Litig.*,
  601 F. Supp. 2d 1313 (M.D. Fla. 2009) .............................................................. 24

*Stanley v. Novartis Pharm. Corp.*,
  11 F. Supp. 3d 987 (C.D. Cal. 2014) ............................................................. 6, 11

*State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*,
  980 F. Supp. 2d 1031 (N.D. Ind. 2013) ................................................. 20, 21, 22

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

*Topliff v. Wal-Mart Stores E. LP*,
  2007 WL 911891 (N.D.N.Y. Mar. 22, 2007) ........................................................ 13

*In re Viagra Prods. Liab. Litig.*,
  658 F. Supp. 2d 950 (D. Minn. 2009) ................................................................. 24

*In re Vioxx Prods. Liab. Litig.*,
  448 F. Supp. 2d 741 (E.D. La. 2006) ................................................................. 24

**Rules**

Federal Rule of Evidence 403 ................................................................. 2, 23, 24, 25

Federal Rule of Evidence 702 ............................................................................. *passim*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

1     <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2         Plaintiffs' purported communications and regulatory expert, Louis Morris,

3     Ph.D., does not use any evidence or data to support his opinion that Lilly's Cymbalta

4     label is inadequate to inform prescribers about the risks of discontinuing Cymbalta.

5     Indeed, his conclusory assertion that a hypothetical "reader" would misunderstand the

6     label's discussion of Cymbalta's discontinuation symptoms is unsupported by any

7     reliable methodology and will not assist the trier of fact.  *See* Paley Decl. Ex. A

8     (Expert Report of Louis Morris, Ph.D., Sept. 18, 2014) ("Rep.") at 10.  His remaining

9     opinions either parrot the conclusions of others or are irrelevant to this case.  Under

10    Federal Rule of Evidence 702, therefore, this Court should exclude his proposed

11    expert testimony in its entirety.

12        *First*, Dr. Morris does not use any methodology to conclude that physicians

13    would fail to understand the label's description of discontinuation risks.  As a social

14    psychologist, he has training in and experience with social scientific methods that

15    could have lent reliability to his claims about how physicians understand the label—

16    including focus-group analysis, surveying, and comprehension testing.  He regularly

17    employs these methods in his professional research.  Oddly, however, instead of

18    employing any of these methods in this case, Dr. Morris simply presents himself as an

19    expert in communication and reading.  He assumes that a "reader" would find the

20    label's discussion of discontinuation symptoms misleading, without pointing to any

21    empirical support.  *See* Rep. at 10.  His unfounded, untested, and unmoored opinions

22    are mere speculation, falling short of Rule 702's standard for reliable testimony.  In

23    this Circuit, moreover, because Dr. Morris formed his opinion for the purpose of this

24    litigation (rather than forming his opinion through independent research), the

25    threshold for reliability is even higher: He was required to explain precisely how he

26    reached his conclusion and to verify his methodology with an external, objective

27    source.  *See, e.g.*, *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir.

28    1995) ("*Daubert II*")).  He has not done so; far from it, he assumes his conclusion.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Furthermore, his speculation about how a "reader" would interpret the label cannot assist the trier of fact. A jury is presumptively literate; it does not need an expert's lesson in reading. Because Dr. Morris's testimony does not involve the application of any expertise, it also fails the relevance standard of Rule 702.

*Second*, Dr. Morris attempts to bolster the conclusions in his report by repeating the statements of others, such as the Institute for Safe Medication Practices. Grafting the opinions of others onto his report, without conducting any independent review or analysis, cannot stand in for a reliable methodology. Such "me too" testimony is also irrelevant, as it does not assist the jury's understanding.

*Third*, Dr. Morris's opinions regarding Cymbalta's European Union ("EU") label are irrelevant because foreign regulatory requirements are ancillary to this case. In addition, he possesses no expertise about these foreign standards for labeling. His testimony on this subject not only violates the relevance and qualification prongs of Rule 702, but also violates Federal Rule of Evidence 403, as it risks jury confusion.

## BACKGROUND

Dr. Morris did not attend medical school, nor is he a psychiatrist or clinical psychologist, the disciplines focused on diagnosis and treatment of mental and behavioral disorders. *See* Rep. at 16; Paley Decl. Ex. B. (Deposition of Lou Morris, Ph.D., Nov. 24, 2014) ("Dep.") at 71:9-17. He has never treated patients medically or prescribed medication. *See* Dep. at 27:7-16, 71:5-72:4. Rather, he is a social psychologist by training and practice. *See* Rep. at 16; Dep. at 26:17-20, 72:3-4. He defines social psychology as "the study of how people interact in social situations." Dep. at 26:24-25.

After completing his Ph.D. in social psychology, Dr. Morris joined the FDA, where he worked on projects involving drug advertising, marketing, and risk communication to patients and consumers. *See* Rep. at 1-2; Dep. at 32:8–33:8, 33:25–34:21; *see also id.* at 74:7-22 (testifying that, while at the FDA, he headed the "patient labeling side" of the Prescription Drug Labeling Project); *id.* at 21:7-17 (clarifying

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

that "patient labeling" is distinct from the "physicians' package insert," which is commonly referred to as the "label" and directed to physicians).  He now consults "on occasion" for pharmaceutical, healthcare, advertising, and communication companies, providing them with advice and research.  *See* Dep. at 15:15-22; *see also* Rep. at 1.  During his career, he has held teaching positions in the fields of advertising, marketing, and consumer behavior.  Rep. at 2.  He has authored several social scientific articles on the topic of communicating risk to patients and consumers.  *See, e.g.*, *id.* at 18.

He has training in and experience with the tools of social science.  *See id.* at 1-3.  As a consultant, for example, he performs "comprehension testing" to help companies formulate communications about their medicines.  *See* Dep. at 69:7–70:5 (defining comprehension testing as tool to determine how an audience interprets and understands information).  The majority of his comprehension testing work relates to consumer-facing materials.  *See id.*

None of Dr. Morris's past work related to the FDA-approved physicians' package insert for Cymbalta ("the Cymbalta label"), Cymbalta's discontinuation risks, Lilly consumer information related to Cymbalta, the SSRI/SNRI class of antidepressants that include Cymbalta, or antidepressant discontinuation syndrome.  *See id.* at 66:19–68:14, 73:8-19, 247:19–248:5.  Dr. Morris acknowledged that, before this case, he had never analyzed antidepressant labels or focused on their discussion of discontinuation symptoms.  *Id.* at 110:1-23.  Dr. Morris also acknowledged that he is "not an expert in [antidepressant] discontinuation syndrome," *id.* at 72:5-11, and that he has "no knowledge of what physicians . . . at a baseline understand about discontinuation," *id.* at 247:3-7.

Still, Plaintiffs enlisted Dr. Morris to "provide an expert opinion concerning the adequacy of the communication of product information" by Lilly in its physicians' package insert, or label, for Cymbalta.  Rep. at 1.  In the initial sections of his report, Dr. Morris simply summarizes publicly-available information about Cymbalta.  He

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

1   quotes iterations of the Cymbalta label, without drawing on his expertise to offer any
2   analysis beyond a superficial recitation of the label's text.  *See id.* at 4-9.  In the latter
3   sections of his report, Dr. Morris repeats the conclusion of Dr. Joseph Glenmullen—a
4   psychiatrist and Plaintiffs' proffered general causation expert—that "Cymbalta causes
5   withdrawal symptoms," without offering any additional analysis.  *See. id.* at 11.  In the
6   penultimate section of his report, Dr. Morris repeats the Cymbalta-related findings of
7   the Institute for Safe Medication Practices, which publishes a newsletter called
8   *QuarterWatch* that evaluates FDA-reported adverse events.  *See id.* at 11-12.  He does
9   not analyze the *QuarterWatch* reports or their underlying data.  Instead, he merely
10  quotes their findings.  *See id.*  In the final section of his report, he simply contrasts the
11  language of Cymbalta's U.S. label with the language of Cymbalta's EU label, without
12  noting the differing regulatory requirements for medicines or examining how other
13  similar medicines are labeled in the EU.  *See id.* at 12-13.

14      The only section of his report that even *arguably* contains any independent,
15  expert analysis spans one page.  *See id.* 9-10.  In a section titled, "Interpretation of
16  Discontinuation Rate," he opines that the Cymbalta label's "description of the rate of
17  discontinuation symptoms . . . is misleading" to physicians.  *Id.* at 10.  Specifically, he
18  opines that a "reader" would interpret the label's guidance that certain **individual**
19  discontinuation symptoms have been reported to occur in clinical trials at a rate of 1%
20  or greater to mean that the overall frequency of occurrence for **all** discontinuation
21  symptoms is only 1%.  *Id.*  But Dr. Morris does not bother explaining how he reached
22  his conclusion that any "reader" would inevitably read the label's "1% or greater"
23  language as referring to the aggregate rate of all discontinuation symptoms—rather
24  than the threshold above which certain individual symptoms arose in the Cymbalta
25  clinical trial experience.   Nor does he attempt to support his opinion with any
26  empirical method, such as focus-group analysis, surveying, or comprehension testing.

27      Dr. Morris needed only eight days to complete his analysis and prepare his
28  report.  *See* Dep. at 41:13–21 (testifying that he started preparing his report on Sept.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- 4 -

10, 2014).   Although he acknowledged that, in preparing his report, it would have been worthwhile to review Lilly's correspondence with the FDA on Cymbalta, he neither reviewed this material nor received it from Plaintiffs' counsel.  *Id.* at 44:25–45:22; *see also id.* at 80:1-7 (testifying that he neither reviewed nor received Lilly's submissions to the FDA's Division of Drug Marketing Advertising and Communication (DDMAC)).   In preparing his report, he also neither reviewed nor received "internal Lilly documents," including Lilly's clinical study reports on Cymbalta discontinuation, *id.* 43:1-16, 82:2-10, Lilly's periodic safety update reports, *see id.* at 44:7-23, or Lilly's unsolicited information requests from physicians regarding Cymbalta, *id.* 182:4-8.   Additionally, he did not perform a comprehensive search of articles related to Cymbalta.  *Id.* at 77:19–78:1.

To be sure, unlike Dr. Glenmullen, Dr. Morris takes aim only at the Cymbalta label's 1% threshold language; he does not challenge other aspects of the label.  *See* Dep. at 88:3–90:12, 108:5-20, 130:20–132:14 (declining to criticize label's tapering instructions); *id.* at 101:17-25 (same on dosage information).   And unlike Dr. Glenmullen, Dr. Morris declines to opine that Lilly intentionally crafted the label to mislead physicians about Cymbalta's discontinuation risks.  *See id.* at 183:11–184:17 (testifying, "I have no knowledge of Lilly's motivations," and "I do not have any – any sense that they were trying to hide information").   Compared with Dr. Glenmullen's opinion, then, Dr. Morris's opinion is commendably tentative.  *See, e.g.*, 90:5-12 ("It's a tentative opinion [on tapering], but I'd have to see, you know, what the information was versus to see, you know, how much there was a problem, but for the most part, the tapering issue was not part of my analysis of whether the severity or the frequency of the risks were misleading or not."); *id.* at 90:17-22 ("Q. Your criticism is that the label didn't accurately reflect the severity of discontinuation, that's one of your opinions, correct? A. Well, more – more – more the frequency, but also the severity to some extent.").   Under the applicable legal standards, however, an expert's tentativeness cannot save his opinion from exclusion.

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## APPLICABLE LEGAL STANDARDS

Under Rule 702, the proponent of expert testimony bears the burden of showing by a preponderance that (i) the expert is qualified, (ii) the testimony is reliable, and (iii) the testimony is relevant and will assist the jury.  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  In this Circuit, a perfunctory showing will not suffice; before expert testimony is admitted, the trial court must engage in the "complex," "daunting," and "difficult" task of ensuring that the testimony satisfies the strictures of Rule 702. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"); *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (holding that trial court abused its discretion "by failing to make appropriate determinations under  [Rule 702]," which "'contemplates some degree of regulation of the subjects and theories about which an expert may testify'" (citation omitted)).  "A trial court's 'gatekeeping' obligation to admit only expert testimony that is both reliable and relevant is especially important 'considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony.'"  *Stanley v. Novartis Pharm. Corp.*, 11 F. Supp. 3d 987, 995 (C.D. Cal. 2014) (citation omitted).

*Relevance:*  Under Rule 702's relevance prong, expert testimony must assist the trier of fact in understanding the evidence or determining a factual issue, Fed. R. Evid. 702, or "'logically advance[] a material aspect of the proposing party's case,'" *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1171 (N.D. Cal. 2007) (citing *Daubert II*, 43 F.3d at 1315).

*Reliability:*  Rule 702's reliability prong requires the proponent to show that the expert testimony is "based on sufficient facts or data" and is "the product of reliable principles and methods" that have been "reliably applied" to the "facts of the case." Fed. R. Evid. 702.  To discharge its responsibility as gatekeeper and to uphold the requirement of reliability, the trial court must determine "whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

scientific method,' and whether their work product amounts to 'good science.'"
*Daubert II*, 43 F.3d at 1315. "The trial judge's obligation 'is to make certain that an
expert . . . employs in the courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field.'" *In re Bextra*, 524 F.
Supp. 2d at 1171 (quoting *Kumho Tire Co.*, 526 U.S at 152). The proponent must thus
"explain the expert's methodology and demonstrate in some objectively verifiable
way that the expert has both chosen a reliable scientific method and followed it
faithfully." *Daubert II*, 43 F.3d at 1319 n.11.[1]

In this Circuit, an "untested," "unsubstantiated," or "undocumented" opinion is
considered the "antithesis of the scientifically reliable expert opinion admissible under
*Daubert* and Rule 702." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir.
1998); *see also Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1129-30 (D. Ariz. 2001)
(observing that "'scientific' implies a grounding in the methods and procedures of
science," and "'knowledge' connotes more than subjective belief or unsupported
speculation" (citation and internal quotation marks omitted)). "'[N]othing in either
*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion
evidence that is connected to existing data only by the *ipse dixit* of the expert. A court
may conclude that there is simply too great an analytical gap between the data and the
opinion proffered.'" *In re Nexium (Esomeprazole) Prods. Liab. Litig.*, 2014 WL
5313871, at *1 (C.D. Cal. Sept. 30, 2014) (citation omitted).

***Qualifications:***   Finally, an expert's qualifications "are by no means a
guarantor of reliability." *IGT v. Alliance Gaming Corp.*, 2008 WL 7084606, at *7 (D.
Nev. Oct. 21, 2008) (citation and internal quotation marks omitted). "'If the witness is

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

---

[1] Courts consider several factors "relevant to the reliability inquiry," including:
"whether the proffered theory or technique has been tested"; "whether [it] has been
subjected to peer review and publication"; "whether the expert has unjustifiably
extrapolated from an accepted premise to an unfounded conclusion"; "whether the
expert has adequately accounted for obvious alternative explanations"; "whether the
expert is being as careful as he would be in his regular professional work." *In re
Bextra*, 524 F. Supp. 2d at 1171 (citations and internal quotation marks omitted).

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee's note); *see also id.* (observing that "[i]f admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong" (citation and internal quotation marks omitted)).

## ARGUMENT

### I.  Dr. Morris's Opinion That Physicians Would Misread the Cymbalta Discontinuation Warning Is Unreliable and Unhelpful.

#### A.  Dr. Morris's Opinion Is Unsupported by Reliable Methodology.

Dr. Morris squeezes into one page the entirety of his analysis that the Cymbalta label is inadequate to inform physicians about the risks of discontinuing Cymbalta.[2] *See* Rep. at 9-10.  His inchoate logic comprises three steps.  First, he quotes the Cymbalta label, which provides:

> "Following abrupt or tapered discontinuation in placebo-controlled clinical trials the following symptoms occurred at 1% or greater and at a significantly higher rate in duloxetine-treated patients compared to those discontinuing from placebo: dizziness, nausea, headache, paresthesia, fatigue, vomiting, irritability, insomnia, diarrhea, anxiety and hyperhidrosis."

*Id.* at 9 (quoting the November 2011 label) (emphasis omitted).  Second, he quotes a 2005 article in the *Journal of Affective Disorders* ("2005 JAD Article"), which reported the finding of Lilly's clinical studies that 44% of the patients in the initial

---

[2]  Although Dr. Morris opines on how physicians *and patients* understand the Cymbalta label, *see* Rep. at 14, patients' understanding is irrelevant to this case.  Under California law, a pharmaceutical manufacturer's duty to warn about the risks of a prescription medication "runs to the physician, not to the patient."  *See Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 990-91 (C.D. Cal. 2001), *aff'd*, 358 F.3d 659 (9th Cir. 2004).  There is no dispute that the 1% threshold language upon which Plaintiffs focus their critique appears only in the full prescribing information for physicians.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

clinical trials who underwent abrupt discontinuation of Cymbalta experienced at least one discontinuation symptom. *Id.* at 10. He neglects to mention the additional finding that 23% of placebo patients in those same initial clinical trials also experienced at least one discontinuation symptom. *Compare id.* at 10, *with* Paley Decl. Ex. C (D.G. Perahia et al., *Symptoms Following Abrupt Discontinuation of Duloxetine Treatment in Patients with Major Depressive Disorder*, 89 J. of Affective Disorders 207 (2005)).

Third, he asserts that, because the "interpretation of the [label's] phrase '1% or greater' is dependent on the 'context' in which the phrase appears," and "[t]he context for the phrase '1% or greater' is a prior phrase in the sentence noting 'the following symptoms occurred,'" a "reader would interpret the phrase 'the following symptoms occurred' to mean in aggregate, the following symptoms occurred, not that 'each' of the following symptoms occurred." *See* Rep. at 10. Those sentences capture the entirety of his reasoning. Because the 2005 JAD Article showed that the aggregate rate of patients experiencing at least one discontinuation symptom was 44%, Dr. Morris concludes that the label misleads physicians about Cymbalta's discontinuation risks. *See id.* at 10; *id.* at 14 (concluding that "the frequency and/or severity" of the discontinuation symptoms are not "fully or accurately communicated" to physicians).

Yet, Dr. Morris does not bother explaining how he reached his conclusion that a hypothetical "reader" would inescapably interpret the label in his professed way. According to him, the label's phrase, "the following symptoms occurred," *must* be interpreted to mean that the listed discontinuation symptoms occurred at an aggregate rate of 1%. But he does not explain why context compels his interpretation, and why the language forecloses an obvious and natural alternative reading: that each of the listed discontinuation symptoms occurred at a rate of 1% or above in clinical trials. Put differently: Dr. Morris's imagined "reader" is incapable of elementary reading comprehension. His "reader"—that is, a trained physician—is incapable of understanding the meaning of the 1% frequency language without the explicit word

- 9 -

1  "each."  *See* Rep. at 10: *see also* Dep. at 173:12-17.  But Dr. Morris does not explain

2  why a native English speaker, much less a trained physician presumed to bring

3  experience and expertise in the understanding and use of prescription medicines,

4  would be unable to grasp the sentence's obvious, natural meaning.  *See* Rep. at 10.

5  Indeed, a commonsense reading of the label would harmonize with and make

6  sense of the 2005 JAD Article's findings (i) that an aggregate of 44% of patients in

7  clinical trials experienced at least one discontinuation symptom, and (ii) that 23% of

8  placebo patients in clinical trials also experienced at least one discontinuation

9  symptom.  Furthermore, listing the individual discontinuation symptoms that occurred

10  in clinical trials at or above a specified numerical threshold—e.g., 1%—comports with

11  industry standards and FDA regulations.  The FDA, in fact, approved the Cymbalta

12  label's frequency language, even though it was familiar with the raw data of the 2005

13  JAD Article; the FDA understood that the 1% provides a threshold for listing the most

14  frequently seen events (depending on the time period at issue, the label includes about

15  a dozen symptoms), while the 44% represents the percentage of patients who

16  experienced any type of  discontinuation event in these early trials.[3]

17  At bottom, Dr. Morris does no more than read the label and put forward his

18  idiosyncratic linguistic construction as gospel, without employing any discernible

19  methodology.  He *assumes* that trained physicians will inexorably misread the label to

20  mean that an aggregate of only 1% of patients experienced any discontinuation

21  symptom—contrary to the label's plain language, despite the publicly available 2005

22  JAD Article's detailed summary indicating that an aggregate of 44% of patients (and

23  23% of placebo patients) experienced at least one discontinuation symptom, and

24

25  [3] *See, e.g.*, *McDowell v. Eli Lilly & Co.*,  --- F. Supp. 3d. ---, 2014 WL 5801604, at
*12 (S.D.N.Y. Nov. 7, 2014) (holding that, as a matter of law, the Cymbalta label's

26  1% frequency language is adequate, and noting that "[t]his method of communicating
information on individual symptoms . . . is consistent with the accepted practice of

27  identifying such individual adverse events observed at or above a specified threshold

28  and in accord with FDA regulations and guidance").

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

1   irrespective of the collective experience of the medical community in observing and

2   treating discontinuation symptoms from this class of medicines over the past thirty

3   years.  His conclusory assertion cannot satisfy Rule 702.  *See Stanley*, 11 F. Supp. 3d

4   at 1002 (excluding bisphosphonate dosing opinion because expert had "not provided

5   any data to support" its reliability, "only vaguely referenced potential sources of

6   information on which he based this opinion during his deposition, and there [was] no

7   indication that [he] used any methodology in reaching this conclusion"); *Durkin v.*

8   *Equifax Check Servs., Inc.*, 406 F.3d 410, 421 (7th Cir. 2005) (affirming exclusion of

9   linguist's expert testimony, proffered by plaintiffs alleging a Fair Debt Collection

10  Practices Act violation, that language of debt collection letters was confusing, because

11  linguist had failed to "sufficiently articulat[e] the manner and method by which he

12  determined the challenged language was confusing" (citation and internal quotation

13  marks omitted)); *In re Bextra*, 524 F. Supp. 2d at 1171 (observing that an expert's

14  failure to "adequately account[] for obvious alternative explanations" weighs against

15  reliability (citation and internal quotation marks omitted)).

16  **B.    Dr. Morris Neglected to Support His Opinion With Social Scientific**
17  **Tools or Empirical Evidence.**

18          Despite his own social science background, Dr. Morris did not use any methods

19  of social science to derive or substantiate his opinion.  Dr. Morris did not conduct or

20  cite any interviews, questionnaires, surveys, focus groups, "comprehension testing,"

21  or use any other form of empirical evidence or data to test or inform his opinion on

22  physicians' understanding of the Cymbalta label, Cymbalta's discontinuation risks, or

23  antidepressant discontinuation risks generally.  *See* Dep. at 66:19–67:19 (testifying

24  that he had not conducted any focus groups with physicians about the Cymbalta

25  label); *id.* at 165:1-14 (testifying that he had not interviewed physicians or conducted

26  any physician focus groups or surveys to determine their view of the Cymbalta label);

27  *id.* at 73:8-12 (testifying that he could not recall conducting any focus groups with

28  physicians to evaluate their understanding of SSRIs and SNRIs, the class of medicines

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- 11 -
MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  used to treat psychiatric disorders); *id.* at 247:20–248:5 (testifying that he had not

2  conducted a focus group or survey of psychiatrists or general practitioners who

3  prescribe antidepressants to determine their understanding of antidepressant

4  discontinuation symptoms); *see also id.* at 68:10-14 (testifying that he had conducted

5  no comprehension testing for consumer information distributed by Lilly relating to

6  Cymbalta); *id.* at 73:13-19 (testifying that he had conducted no comprehension testing

7  of patients related to patient-related materials concerning SSRIs or SNRIs).

8       In this vein, Dr. Morris's opinion is analogous to the opinion excluded in *Calisi*

9  *v. Abbott Laboratories*, 2013 WL 5441355, at *6-10 (D. Mass. Sept. 27, 2013).

10  There, the plaintiffs' regulatory and labeling expert opined that the label for Humira, a

11  rheumatoid arthritis drug, was inadequate to inform doctors (and patients) about the

12  risk of lymphoma associated with the use of Humira.   *Id.* at *8.   But the expert

13  conducted no focus groups or surveys of physicians or rheumatologists to assess their

14  view of the label.   *Id.* at *9.   Nor did the expert cite any published or peer-reviewed

15  medical literature supporting his assessment.   *Id.*   Because the expert had used "no

16  methodology" to "assess the effect of the label on a prescribing medical doctor," "took

17  no steps to determine if the label [was] misleading, confusing or downplayed any

18  relevant risk," and offered "no facts to form the basis of his 'adequacy' opinion," the

19  court determined that his opinion was unreliable under Rule 702.   *Id.* at *10.

20       Similarly, in *Bickel v. Pfizer, Inc.*, the court excluded the testimony of an expert

21  who opined that statins can cause anterior ischemic optic neuropathy because the

22  expert had not relied "upon any valid scientific methodology in forming her opinion."

23  431 F. Supp. 2d 918, 922 (N.D. Ind. 2006).   As the court reasoned: "She did not

24  conduct any scientific tests, experiments, or clinical studies to bolster her theory . . .

25  nor did she produce or rely upon any such studies to verify her conclusions.   Such

26  insulation of her theory from the dispassionate crucible deeply, if not fatally,

27  compromises her testimony's reliability."   *Id.* (citation, internal quotation marks, and

28  alterations omitted); *see also Topliff v. Wal-Mart Stores E. LP*, 2007 WL 911891, at

1   *18 (N.D.N.Y. Mar. 22, 2007) (finding expert's opinion to be "devoid of any

2   scientific method" because it was not based on "any sort of test or consumer survey of

3   the efficacy of a warning on the [product] in question"); *Dewick v. Maytag Corp.*, 324

4   F. Supp. 2d 894, 900 (N.D. Ill. 2004) (excluding expert's warning opinion

5   unsupported by any test of the original warning's efficacy or by other methodology as

6   "speculation or personal observation"); *In re Bextra*, 524 F. Supp. 2d at 1171 (noting

7   that an expert's failure to test a proffered theory weighs against reliability).

8        Here, too, Dr. Morris impermissibly attempts to "insulat[e] [his] theory from

9   the dispassionate crucible." *See Bickel*, 431 F. Supp. 2d at 922.  Like the expert in

10  *Calisi*, he attempts to make an empirical claim about the behavior of physicians—that

11  is, how physicians view the drug's label—but he neglects to gather or reference any

12  empirical evidence to support that claim. *See* 2013 WL 5441355, at *10.  He used "no

13  methodology" to "assess the effect of the [Cymbalta] label on a prescribing medical

14  doctor," "took no steps to determine if the [Cymbalta] label" was, in fact,

15  "misleading," and offered "no facts to form the basis of his 'adequacy' opinion." *See*

16  *id.* at *10.  Under Rule 702, his empirically empty reasoning fatally compromises his

17  testimony's reliability.  *See Bickel*, 431 F. Supp. 2d at 922.

18        **C.    Dr. Morris Did Not Employ The Same Level of Scientific Rigor That**
           **Characterizes Work in the Field.**
19

20        The purpose of Rule 702's gatekeeping requirement is to make certain that an

21  expert "'employs in the courtroom the same level of intellectual rigor that

22  characterizes the practice of an expert in the relevant field.'"  *In re Bextra*, 524 F.

23  Supp. 2d at 1171 (quoting *Kumho Tire*, 526 U.S. at 152 (1999)); *see also id.*

24  (observing that an expert's failure to be "as careful he would be in his regular

25  professional work" weighs against reliability (citation and internal quotation marks

26  omitted)); *Fidelity Nat. Fin., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 2014

27  WL 1286392, at *3 (S.D. Cal. Mar. 28, 2014) (noting that an expert cannot have a

28  double standard for testimony versus professional work (citation omitted)).  At his

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- 13 -

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

deposition, Dr. Morris acknowledged that social science techniques such as surveying, focus-group analysis, and comprehension testing are standard tools in the research toolkit for evaluating statements in communication materials.  *See, e.g.*, Dep. at 68:23–69-16 (testifying that FDA requires comprehension testing).  He acknowledged that he routinely employs these social science tools in his professional work.  *See id.* at 66:13–69:23 (testifying that he employs tools such as physician focus groups and surveys in his work); *see also id.* at 248:6-11.  For this litigation, however, Dr. Morris has abandoned the very methods that he uses in his own consulting practice for evaluating how information about medicines is understood.  His resort to a "double standard for testimony versus professional work" further exposes the unreliability of his conclusions.  *See Fidelity*, 2014 WL 1286392, at *3.

Indeed, at his deposition, Dr. Morris even acknowledged the shortcomings of his courtroom opinion.  He admitted that, in preparing his report, it would have been worthwhile to review Lilly's correspondence with the FDA on Cymbalta and the label.  Dep. at 44:25–45:22.  But he neither reviewed this material nor received it from Plaintiffs' counsel.  *Id.*; *see also id.* at 80:1-7 (testifying that he neither reviewed nor received Lilly's submissions to the FDA's Division of Drug Marketing Advertising and Communication (DDMAC)).  He also neither reviewed nor received "internal Lilly documents," including Lilly's clinical study reports on Cymbalta discontinuation.  *Id.* at 43:1-16, 82:2-10.  Nor did he search for publications on clinical trials involving Cymbalta other than the 2005 JAD Article, *id.* at 87:15-19, or perform any comprehensive search of articles related to Cymbalta generally, *id.* at 77:19–78:1.  Overall, he spent eight days preparing a report that primarily regurgitates the contents of public documents and contains only one page of meager analysis.  *See* Background at 4.  His opinion is not based on sufficient facts or data, is not the product of a reliable method, and fails to employ "the level of intellectual rigor" that characterizes social science.  *See In re Bextra*, 524 F. Supp. 2d at 1171.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

### D. Dr. Morris's Experience Is Not Sufficiently Linked to His Opinion or Sufficiently Relevant to Render It Admissible.

Dr. Morris's professional experience alone cannot cure the methodological deficiencies in his opinions. Rather, he must "'explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *IGT*, 2008 WL 7084606, at *7 (quoting Fed. R. Evid. 702 advisory committee's note). The court's decision in *Kaufman v. Pfizer Pharms., Inc.*, is instructive. 2011 WL 7659333, at *7 (S.D. Fla. Aug. 4, 2011). There, the plaintiff's regulatory and labeling expert based her opinion concerning Prempro, a drug used to treat menopause, on her extensive résumé. *Id.* The court, however, refused to permit her professional experience to stand in for a methodology because she had made no attempt to analytically link her experience with her opinion:

> [The expert] may not render an opinion and then merely state that it is based on her experience. Instead, she must explain the underlying experiences and how they inform her opinions. Specifically, she must explain *how* her experiences led to the conclusions she reached, *why* her experiences are sufficient bases for her opinions, and how her experiences are *reliably* applied to the facts of the case. The [Court's] gatekeeping function requires more than simply taking the expert's word for it. The Court has scoured [the expert's] mammoth report but has not found any instances where she explains how her regulatory or other professional experience led her to [her conclusion] and why and how her experience provided sufficient basis for her to render such an opinion.

*Id.* (citations and internal quotation marks omitted).

Likewise here, Dr. Morris makes no attempt to explain how his experience leads him to conclude that a physician would read the Cymbalta label as he professes, why his experience is a sufficient basis for his opinion, and how he has reliably applied his experience to the facts of the case. *See id.*; *see also IGT*, 2008 WL

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

7084606, at *7 (citing Fed. R. Evid. 702 advisory committee's note).  In fact, the page of his report that arguably contains analysis—however limited—makes no mention of his professional experience.  Dr. Morris has failed to tether his conclusion to any reliable methodology *or* to any relevant professional experience.  Instead, he is content to rest on his claimed credentials, expecting this Court to make the connection for him.  As in *Kaufman*, however, this Court's "gatekeeping function requires more than simply taking the expert's word it."  2011 WL 7659333, at *7 (citation and internal quotation marks omitted).

Furthermore, even if Dr. Morris attempted to connect his experience with his opinion, his experience is insufficiently "related to the issues and evidence before the trier of fact" to be "of assistance to the trier of fact."  *In re Apollo Grp. Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 960 (D. Ariz. 2007) (citation and internal quotation marks omitted); *see also Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353, 1357 (D. Ariz. 1996) (noting that an expert's "expertise and experience" must "fit" the facts of the case), *aff'd*, 114 F.3d 851 (9th Cir. 1997).  None of Dr. Morris's past work related to the Cymbalta label, Cymbalta's discontinuation risks, Lilly consumer information related to Cymbalta, the SSRI/SNRI class of antidepressants that include Cymbalta, or antidepressant discontinuation syndrome.  *See* Dep. at 66:19–68:14, 73:8-19, 247:19–248:5.  Dr. Morris acknowledges that, before this litigation, he had not analyzed antidepressant labels or focused on their discussion of discontinuation symptoms.  *Id.* at 110:1-23.  Dr. Morris further acknowledges that he is not an expert in discontinuation syndrome and that he has "no knowledge of what physicians . . . at a baseline understand about discontinuation."  *Id.* at 247:3-7; *see also id.* at 72:5-11.  Dr. Morris is experienced in social psychology generally, but is unqualified to opine that the Cymbalta label misleads physicians about Cymbalta's discontinuation risks. [4]

---

[4] Had Dr. Morris attended medical school and attained a psychiatry license, he still could not rely on his professional experience to reliably opine that (i) physicians misunderstand the label's discussion of Cymbalta's discontinuation risks, or that (ii) physicians tend to learn about a drug from the label rather than from other sources of (continued . . . )

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    **E.     Dr. Morris Formed His Opinions for This Litigation.**

2         In addition, for a litigation-driven opinion like Dr. Morris's, the threshold for

3    reliability under Rule 702 is even higher.   The Ninth Circuit has emphasized that a

4    "very significant" factor in the reliability inquiry is whether the "expert[] [is]

5    proposing to testify about matters growing naturally and directly out of research [she

6    has] conducted independent of the litigation, or whether [she has] developed [her]

7    opinions expressly for purposes of testifying."   *Daubert II*, 43 F.3d at 1317.   "If the

8    proffered expert testimony is not based on independent research," the proffering party

9    may demonstrate the testimony's reliability by showing that "the research and analysis

10   supporting the proffered conclusions have been subjected to normal scientific scrutiny

11   through peer review and publication."   *Id.* at 1317–18.   "When such evidence is

12   unavailable," the expert "must explain precisely how [she] went about reaching [her]

13   conclusions and point to some objective source—a learned treatise, the policy

14   statement of a professional association, a published article in a reputable scientific

15   journal or the like—to show that [she has] followed the scientific method, as it is

16   practiced by (at least) a recognized minority of scientists in their field."   *Id.* at 1318-

17   19; *accord Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996);

18   *Hickman v. Sofamor-Danek Grp., Inc.*, 1999 WL 606690, at *9 (N.D. Cal. Feb. 17,

19   1999) (excluding diagnostic testimony of medical expert who failed to "support[] his

20   conclusions with peer-reviewed research, identif[y] an objective source of information

21   on which his conclusions were based, or demonstrate[] that he followed a generally

22   _____

23   medical information, such as published, peer-reviewed literature.   *Compare* Rep. at
     10-11, *with In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 555-56 (S.D.N.Y.

24   2004) (holding that expert physicians could not properly testify to the general
     "practices of physicians as to reading labels," or to physicians' "understandings of the

25   contents" of the label for Rezulin, a diabetes medication, or "what other physicians
     understood about the risks and benefits of Rezulin"), *and In re Seroquel Prods. Liab.*

26   *Litig.*, 2009 WL 3806436, at *7 (M.D. Fla. July 20, 2009) ("[N]one of [p]laintiffs'

27   experts," including a psychiatrist, "may properly testify regarding whether physicians
     generally read and comprehend drug labels, or whether doctors generally understand

28   the contents of the [label for Seroquel, an antipsychotic medication].").

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

1   accepted or scientifically reliable diagnostic methodology used by other professionals

2   in the field").

3        To illustrate, although the experts in *Daubert II* "relied on animal studies,

4   chemical structure analyses and epidemiological data" to support their opinion about

5   Benedictin, a morning sickness medication, the Ninth Circuit affirmed the exclusion

6   of their opinion because (i) the opinion had not grown naturally and directly out of

7   independent research, (ii) the opinion was not supported with peer-reviewed research,

8   and (iii) the experts had failed to "explain the methodology [they] followed to reach

9   their conclusions [or] point to any external source to validate that methodology."

10  *Daubert II*, 43 F.3d at 1317-19; *see also id.* at 1319 ("We've been presented with only

11  the experts' qualifications, their conclusions and their assurances of reliability. Under

12  *Daubert*, that's not enough.").

13       Here, before preparing for this litigation and drafting his expert report, Dr.

14  Morris had never researched or written about the Cymbalta label, Cymbalta's

15  discontinuation risks, or physicians' understanding of the Cymbalta label or

16  Cymbalta's discontinuation risks.  *See supra* Background at 3; Dep. at 66:19–68:14,

17  72:5-11, 73:8-19, 247:3-7, 247:19–248:5.   Before this litigation, he had never

18  analyzed antidepressant labels or focused on their discussion of discontinuation

19  symptoms.  *Id.* at 110:1-23.  His opinion did not grow naturally and directly out of his

20  research; he formed his opinion solely for this litigation.  Like the experts in *Daubert*

21  *II*, however, Dr. Morris has neglected to support his litigation-driven opinion with

22  peer-reviewed research, precisely explain how he reached his conclusion, or point to

23  an objectively verifiable, external source to show that he has followed a reliable,

24  scientific method.  *See* 43 F.3d at 1317–19.  Instead, in one undeveloped paragraph on

25  page 10 of his report, he simply assumes his conclusion that a physician would read

26  the Cymbalta label as stating that the aggregate risk of any discontinuation symptom

27  occurring is about 1%.  Such bootstrapping logic cannot survive the crucible of the

28  Ninth Circuit's ordinary reliability standard—much less the heightened one.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**F.     Dr. Morris's Opinion Is Unhelpful to the Jury.**

Dr. Morris's opinion that physicians will invariably misunderstand the Cymbalta label not only violates Rule 702's reliability prong; it also violates Rule 702's relevance prong.  That is, his proposed expert testimony will not assist the jury in understanding the evidence or determining a fact in issue.  *See* Fed. R. Evid. 702; *In re Bextra* 524 F. Supp. 2d at 1171.  In arguing that "[t]he interpretation of the [label's] phrase '1% or greater' is dependent on the 'context' in which the phrase appears," *see* Rep. at 10, Dr. Morris presents himself as an expert in reading.  Yet, the jury does not require the assistance of an expert to read the language of the label.  Reading is not "beyond the common knowledge of the average layman." *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 542 (C.D. Cal. 2012) (citation and internal quotation marks omitted).

**G.     *McDowell* Illustrates the Unreliability and Irrelevance of Dr. Morris's Opinion on the Cymbalta Label.**

In *McDowell v. Eli Lilly & Co.*, Judge Sweet granted summary judgment for Lilly, holding that the Cymbalta's discontinuation warning was "adequate as a matter of law because it is 'accurate, clear, consistent on its face' and 'portrays with sufficient intensity the risk involved in taking the drug.'"  --- F. Supp. 3d. ---, 2014 WL 5801604, at *15 (S.D.N.Y. Nov. 7, 2014) (citation omitted).  In seeking reconsideration of that ruling, Plaintiff's counsel submitted the expert reports from this case, including that of Dr. Morris.  Judge Sweet denied Plaintiff's motion. *McDowell v. Eli Lilly & Co.*, 2015 WL 845720, at *1-6 (S.D.N.Y. Feb. 26, 2015).  In so ruling, Judge Sweet rejected Plaintiff's reliance on Dr. Morris's report to undermine his summary judgment decision because Dr. Morris's opinion "add[ed] nothing" to the label's "plain language":

> Dr. Morris, a social psychologist, not a medical doctor (*see* Morris Report at 1) states, as [the plaintiff] has continued to argue, that the phrase "1% or greater" in the label is misleading to medical professionals in the

- 19 -

context in which it appears (*see* Morris Report at 10) based on his reading of the language of the label itself.  (*See id.* (explaining how "a reader would interpret the phrase" without citation).)  However, it has already been found . . . that the plain language of the warning properly describes the risks alleged. (*See generally* November 7 Order.)  Although McDowell argues the adequacy of [Lilly's] warning in light of FDA's regulations and guidances, Dr. Morris' report does not rely on or analyze any of those sources.  Dr. Morris' opinion therefore adds nothing in the face of the warning's plain language . . . .

*Id.* at *5.  This Court should follow Judge Sweet's reasoning and hold that here, too, Dr. Morris's opinion—which he renders "without citation" and which is based on nothing more than "his reading of the language of the label itself—"adds nothing" reliable or relevant to the "analysis of the adequacy of Cymbalta's warning." *See id.*

## II.     Dr. Morris's Opinions That Repeat the Conclusions of Others Are Unreliable and Unhelpful.

### A.     Dr. Morris Parrots ISMP's Findings Without Analysis.

It is well settled that an expert may not "merely repeat[] facts or opinions stated by other potential witnesses or in documents produced in discovery," or "[draw] simple inferences from documents produced in discovery." *See In re Rezulin*, 309 F. Supp. 2d at 546-47.  First, under Rule 702's reliability prong, acting as a mouthpiece for another witness is not a methodology.  *State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1039 (N.D. Ind. 2013) (excluding defendant's warning and safety expert's statistical testimony concerning clothes dryer susceptibility to fire as unreliable because expert "did nothing additional to research the sources of the information, how the data was compiled, or verify the reliability of the data" which she received from the defendant and upon which she based her conclusion).  Second, under Rule 702's relevance prong, such repetition will not assist the jury in understanding the case.  *See In re Rezulin*, 309 F. Supp. 2d at 546-47 (excluding expert testimony of diabetes specialist in products liability litigation

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

1   involving Rezulin, a diabetes drug, because expert's repetition of facts and simple

2   inferences could not help the jury).

3        Here, in a section of his report titled "Institute of [sic] Safe Medication [sic]

4   Practices (ISMP) Report on Cymbalta," Dr. Morris repeats the findings of the Institute

5   for Safe Medication Practices ("ISMP") newsletter *QuarterWatch* concerning

6   discontinuation symptoms associated with Cymbalta.   *See* Rep. at 11-12.

7   *QuarterWatch* draws its data from the FDA Adverse Event Reporting System

8   ("FAERS"), a publicly-available database of reports of adverse events or medication

9   errors that are spontaneously and voluntarily communicated to the FDA by healthcare

10  providers or consumers.   Dr. Morris admits that he did not review the underlying

11  FAERs data or otherwise perform any independent analysis of *QuarterWatch*'s

12  findings.  *See* Dep. at 197:12–198:2.   At his deposition, Dr. Morris even admitted that

13  the *QuarterWatch* reports formed no part of his (limited) analysis.   He testified that he

14  "didn't use [*QuarterWatch*] as the basis of my opinion or have any opinion about it."

15  *Id.* at 199:9-11.   He included it only because "here was another – another group or

16  people, whoever, who had a[n] opinion very similar to mine."   *Id.* at 199:11-13; *see*

17  *also id.* at 242:20-24 (testifying that he cited the *QuarterWatch* reports only because

18  they mirrored his opinion).[5]

19        Like the experts in *In re Rezulin* and *State Farm*, Dr. Morris regurgitated the

20  findings of *QuarterWatch*, without making any attempt to   verify their validity

21  independently.  *See State Farm*, 980 F. Supp. 2d at 1039; *In re Rezulin*, 309 F. Supp.

22  2d at 546-47.   Indeed, in the *McDowell* decision denying the plaintiff's motion for

23  reconsideration, Judge Sweet held that Dr. Morris's review of the ISMP report "adds

---

24  [5] At various times, he expressed views that conflicted with *QuarterWatch*'s findings—

25  further underscoring *QuarterWatch*'s irrelevance to his analysis.  *Compare* Rep. at 12

26  ("ISMP note[s] that . . . there was insufficient information provided to physicians about how to taper off the medicine . . ."), *with* Dep. at 108:5-20, (declining to

27  criticize Cymbalta label's tapering instructions), *and id.* at 130:20–132:14 (same); *see*

28  *also id.* at 132:24–133:10 (testifying that ISMP was more critical of Cymbalta's tapering instructions than he was).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- 21 -

1  nothing to the analysis of the adequacy of Cymbalta's warning" because it was mere
2  repetition: "Dr. Morris' report does not perform any actual analysis of the ISMP report
3  that would add to this Court's consideration of the report itself but summarizes the
4  allegations."  2015 WL 845720 WL, at *5 (citing Rep. at 11-12).  This Court should
5  similarly determine that Dr. Morris's summary of *QuarterWatch* is unreliable,
6  unhelpful, and inadmissible under Rule 702.

7  ### B.   Dr. Morris Quotes the Cymbalta Label and Repeats Dr.
8  ### Glenmullen's Findings Without Any Analysis.

9  In other sections of his report, Dr. Morris merely quotes iterations of the
10  Cymbalta label and recounts Dr. Glenmullen's findings.  *See* Rep. at 5-9, 11.  This
11  proposed testimony is likewise unreliable, unhelpful, and inadmissible.  *See State*
12  *Farm*, 980 F. Supp. 2d at 1039; *In re Rezulin*, 309 F. Supp. 2d at 546-47.

13  ### III.   Dr. Morris's Opinions on the EU Cymbalta Label Are Irrelevant.

14  In the final section of his report, "EMA Information about Treatment
15  Discontinuation,"  Dr. Morris discusses Cymbalta's EU Summary of Product
16  Characteristic ("SmPC" or "EU label") and argues that "[t]he content and implications
17  of the EU description is [sic] starkly different than the US product information."  Rep.
18  at 13.  He quotes at length from Cymbalta's EU label, noting information that he
19  contends is not present in the U.S. label.  *Id.* at 11-13.

20  As a threshold matter, Dr. Morris's opinions on European regulatory standards
21  are inadmissible under Rule 702 because, as Judge Sweet observed in denying the
22  plaintiff's motion for reconsideration and rejecting Dr. Morris's European musings in
23  *McDowell*, "[t]he mere existence of a differently structured and written European
24  label does not establish that the U.S. label is insufficient, misleading, or legally
25  inadequate, nor is foreign regulatory action even appropriate as a subject of expert
26  testimony in pharmaceutical cases."  *See* 2015 WL 845720, at *5; *see also, e.g.*, *In re*
27  *Rezulin*, 309 F. Supp. 2d. at 553 ("[T]he challenged testimony focuses on a set of non-
28  technical factual allegations—specifically, the actions taken or not taken by foreign

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   regulators or Glaxo-Wellcome with respect to Rezulin—that plaintiffs would use as
2   springboards for arguments about Warner-Lambert's conduct in the United States.
3   None of it qualifies as 'scientific, technical or other specialized knowledge.'"
4   (citations omitted)); *Lofton v. McNeil Consumer & Specialty Pharms.*, 2008 WL
5   4878066, at *6 (N.D. Tex. July 25, 2008) (excluding under *Daubert* expert labeling
6   opinion discussing in part difference between American and European labels), *aff'd*,
7   682 F. Supp. 2d 662 (N.D. Tex. 2010), *aff'd*, 672 F.3d 372 (5th Cir. 2012).

8       Dr. Morris does not even claim expertise in foreign regulatory standards.  His
9   discussion of the EU label is not based on any specialized knowledge or experience.
10  *See IGT*, 2008 WL 7084606, at *7.  And, because this case does not concern European
11  regulatory standards, Dr. Morris's opinions on the EU label will not assist the trier of
12  fact or "'logically advance[] a material aspect of the proposing party's case.'"  *See*
13  *Cloud*, 198 F. Supp. 2d at 1129 (citation omitted).  As the *Cloud* court cautioned:

14      Scientific expert testimony introduces special dangers to the fact-finding
15      process because it can be both powerful and quite misleading because of the
16      difficulty in evaluating it. . . . [J]udges must exclude . . . evidence under Rule
17      702 unless they are convinced that it speaks clearly and directly to an issue in
18      dispute in the case, and that it will not mislead the jury.

19  *Cloud*, 198 F. Supp. 2d at 1130 (citations and internal quotation marks omitted).  This
20  Court should exclude Dr. Morris's proposed testimony on the EU label because it
21  does not "speak[] clearly and directly to an issue in dispute." *See id.*

22      Additionally, under Rule 403, Dr. Morris's proposed testimony on foreign
23  regulatory standards is inadmissible on the independent ground that its probative value
24  is substantially outweighed by the danger of confusing the issues, misleading the jury,
25  and wasting time.  *See* Fed. R. Evid. 403.  Because "American regulators have
26  different priorities . . . than their European counterparts," *Meridia Prods. Liab. Litig.*
27  *v. Abbott Labs.*, 447 F.3d 861, 867 (6th Cir. 2006), introducing evidence of European
28  regulatory standards impermissibly risks jury confusion.  *See, e.g.*, *In re Viagra*

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 965-66 (D. Minn. 2009) (excluding expert testimony on foreign regulatory information under Rule 403). U.S. and foreign regulatory determinations regarding "the necessity of requiring a warning" are based on each country's own "legitimate concerns and its own unique needs." *See Harrison v. Wyeth Labs.*, 510 F. Supp. 1, 4 (E.D. Pa. 1980), *aff'd*, 676 F.2d 685 (3d Cir. 1982). Jurors lack the "context concerning the [foreign] regulatory schemes and decision-making processes" to properly evaluate medicines or labels that are products of that jurisdiction. *See In re Seroquel Prods. Liab. Litig.*, 601 F. Supp. 2d 1313, 1318 (M.D. Fla. 2009) (excluding evidence of foreign regulatory actions because the jury did not have "any framework within which to evaluate the meaning of that evidence"); *cf. In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 741, 748 (E.D. La. 2006) ("An American jury would also have no good means of evaluating whether a given foreign label or marketing scheme was adequate[.]").

Dr. Morris agrees that the FDA and the European Medicines Agency ("EMA") often have different priorities and prerogatives that may lead to different regulatory outcomes concerning the same medicine or risk communications.  Dep. at 249:19–251:7.  None of this context, however, is included in his report's discussion of the EU label.   Rather, the implication of his report is that Cymbalta's EU label is the gold standard, and the U.S. label is substandard, when in fact, the two labels are shaped and approved by two different sets of regulatory standards.  To contextualize the EU label properly, jurors would require evidence of the EMA's approval process, model or mandatory label language, and other relevant regulatory information that is tangentially related to this case.   Presentation of such evidence, however, risks creating a sideshow concerning the EU regulatory system, distracting the jury from the core issues in the litigation and wasting the court's time.  *See In re Seroquel*, 601 F. Supp. 2d at 1318 (observing that, while admitting evidence of foreign regulatory action without context would prejudice defendant pharmaceutical company, admitting such contextual "evidence would result in a series of 'mini-trials' regarding the

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

grounds for the [foreign] decisions and the regulatory schemes[,] … [which] would confuse the jury and waste everyone's time").  To prevent juror confusion and to keep the focus on Lilly's duty of care under U.S. law, Dr. Morris's opinions concerning the EU label should be held inadmissible under Rule 403.

## CONCLUSION

This Court should exclude Dr. Morris's opinions in their entirety.

MOTION TO EXCLUDE TESTIMONY OF MORRIS UNDER FED. R. EVID. 702, 403

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   DATED:        March 4, 2015                Respectfully Submitted,

2
                                               /s/ David E. Stanley
3                                              David E. Stanley
                                               REED SMITH LLP
4
5                                              Michael X. Imbroscio (*pro hac vice*)
                                               Phyllis A. Jones (*pro hac vice*)
6                                              Kathleen E. Paley (*pro hac vice*)
7                                              COVINGTON & BURLING LLP

8                                              Attorneys for Defendant
                                               ELI LILLY AND COMPANY
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- i -