David E. Stanley (SBN 144025)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: (213) 457-8000
Facsimile: (213) 457-8080
dstanley@reedsmith.com

Michael X Imbroscio (pro hac vice)
Phyllis A. Jones (pro hac vice)
Kathleen E. Paley (pro hac vice)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5868
Facsimile: (202) 778-5868
mimbroscio@cov.com
pajones@cov.com
kpaley@cov.com

Attorneys for Defendant
Eli Lilly and Company

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN HEXUM AND NICK HEXUM,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>                    Defendant. | Case No.: 2:13-cv-2701 SVW-MANx<br><br>**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)**<br><br>Date:        April 27, 2015<br>Time:        3:00 PM<br>Location:    Courtroom 6<br>Judge:       Hon. Stephen V. Wilson |

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .......................................................................................ii

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ..........................................................1

INTRODUCTION ........................................................................................................1

ARGUMENT .................................................................................................................2

I.  Plaintiff Cannot Demonstrate Proximate Cause.....................................2

    A.  Dr. Wollaston independently understood Cymbalta's
    discontinuation risks and advised Plaintiff about the
    importance of tapered discontinuation.............................................2

    B.  Because Plaintiff failed to elicit testimony from Dr.
    Wollaston that a stronger label would have changed his
    prescribing decision, she cannot meet her burden of proof on
    proximate cause.....................................................................................5

        (i)  Under California law, the learned intermediary doctrine focuses on
        the prescriber's decision. ...............................................7

        (ii)  Plaintiff cannot satisfy her burden even under the patient-centric
        standard she advances...............................................13

II.  Plaintiff does not provide "clear and convincing" evidence of fraud
to support her punitive damages claim..............................................15

CONCLUSION............................................................................................20

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackley v. Wyeth Labs*,
  919 F.2d 397 (6th Cir. 1990) ..................................................................... 20

*Ames v. Apothecon Inc.*,
  431 F. Supp. 2d 566 (D. Md. 2006) ........................................................... 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................................... 20

*In re Aredia and Zometa Prods. Liab. Litig.*,
  2009 WL 2513555 (M.D. Tenn. Aug. 13, 2009) ...................................... 8, 9

*In re Aredia and Zometa Products Liability Litigation*,
  2009 WL 2497692 (M.D. Tenn. 2009) ................................................. 11, 12

*Basich v. Allstate Ins. Co.*,
  87 Cal.App.4th 1112 (Cal. App. 2 Dist., 2001) ........................................ 15

*Bowles v. Novartis Pharm. Corp.*,
  2013 WL 5297257 (S.D. Ohio, Sept. 19, 2013) .......................................... 9

*Calabrese v. Trenton State College*,
  162 N.J. Super. 145 (N.J. Super. App. Div. 1978), *aff'd*, 413 A.2d 315
  (N.J. 1980) (per curiam) ............................................................................. 20

*Carlin v. Super. Ct.*,
  920 P.2d 1347 (Cal. 1996) ............................................................................ 1

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..................................................................................... 15

*Colville v. Pharmacia & Upjohn Co.*,
  565 F. Supp. 2d 1314 (N.D. Fla. 2008) ....................................................... 6

*Eisenberg v. Permanente Medical Group*,
  855 F. Supp. 2d 1002 (N.D. Cal. 2012) ..................................................... 15

*Ferretti v. Pfizer Inc.*,
  2013 WL 140088 (N.D. Cal. Jan. 10, 2013) .............................................. 15

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

*Gaghan v. Hoffman-LaRoche Inc.*
  2014 N.J. Super. Unpub. LEXIS 1895 (App. Div. Aug. 4, 2014). ....................... 10

*Georges v. Novartis Pharm. Corp.*,
  2012 WL 9083365 (C.D. Cal. Nov. 2, 2012) ........................................ 11

*Gilliland v. Novartis Pharm. Corp.*,
  34 F. Supp. 3d 960 (S.D. Iowa 2014) .............................................. 9

*Guenther v. Novartis Pharm. Corp.*,
  990 F. Supp. 2d 1299 (M.D. Fla. 2014) ............................................ 9

*Haggerty v. Federal Ins. Co.*,
  32 F. App'x 845 (9th Cir. 2012) ................................................. 13

*Hill v. Novartis Pharm. Corp.*,
  2012 WL 6004161 (E.D. Cal. Nov. 30, 2012) ...................................... 11

*Huntman v. Danek Med. Inc.*,
  1998 U.S. Dist. LEXIS 13431 (S.D. Cal. July 24, 1998) ....................... 1, 2

*Hurley v. Lederle Labs.*,
  651 F. Supp. 993 (E.D. Tex. 1986) .............................................. 20

*Johnson & Johnson v. Superior Court*,
  192 Cal. App. 4th 757 (2011) ............................................... 18, 19

*Kirchman v. Novartis Pharm. Corp.*,
  2014 WL 2158519 (M.D. Fla. May 23, 2014) ........................................ 9

*McDowell v. Lilly*,
  --- F. Supp. 3d ---, 2014 U.S. Dist. LEXIS 157819
  (S.D.N.Y. Nov. 6, 2014)..................................................4, 17, 19, 20

*McDowell v. Lilly*,
  2015 U.S. Dist. LEXIS 23445 (S.D.N.Y. February 26, 2015)................... 5, 18, 19

*Motus v. Pfizer Inc.*,
  196 F. Supp. 2d 984 (C.D. Cal. 2001) (*Motus I*)............................. 1, 7, 9

*Motus v. Pfizer Inc.*,
  358 F.3d 659 (9th Cir. 2004) (*Motus II*).................................... 1, 9

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Payne v. Novartis Pharm. Corp.*,
   767 F.3d 526 (6th Cir. 2014) ................................................................. 8

*Rosburg v. Minn. Mining & Mfg. Co.*,
   181 Cal. App. 3d 726 (1986) ......................................................... 1, 2, 5

*Rutherford v. Owens-Illinois Inc.*,
   941 P.2d 1203 (Cal. 1997)..................................................................... 2

*In re Seroquel Prods. Liab. Litig.*,
   2009 U.S. Dist. LEXIS 124798 (M.D. Fla. Jan 30, 2009) ..................... 18

*Sanchez v. Boston Scientific Corp.*
   --- F. Supp. 2d ----, 2014 WL 4059214, *10 (S.D.W.Va. Aug. 18,
   2014) ...................................................................................................... 8

*Stanley v. Novartis Pharm. Corp.*,
   11 F. Supp. 3d 987 (C.D. Cal. 2014) ..................................................... 11

*In re Viagra Prods. Liab. Litig.*,
   658 F. Supp. 2d 950 (D. Minn. 2009) ................................................... 18

*In re: Zyprexa Prods. Liab. Litig. (Neal v. Eli Lilly & Co.)*,
   2009 U.S. Dist. LEXIS 57218 (E.D.N.Y. June 22, 2009), *aff'd*, 394 F.
   App'x 823 (2d Cir. 2010) ............................................................. 6, 9, 10

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Summary judgment is appropriate in this case because two distinct evidentiary showings break the chain of proximate cause between any alleged inadequacy in Cymbalta's warning and the Plaintiff's alleged injury.

*First*, despite Plaintiff's arguments to the contrary, the record demonstrates that Dr. Wollaston had significant and independent knowledge about the risk of Cymbalta discontinuation symptoms when he prescribed the medicine for Plaintiff. This independent knowledge breaks any chain of causation linking any allegedly inadequate warning to her injuries. *See Huntman v. Danek Med. Inc.*, 1998 U.S. Dist. LEXIS 13431 at *20 (S.D. Cal. July 24, 1998); *Rosburg v. Minn. Mining & Mfg. Co.*, 181 Cal. App. 3d 726, 735 (1986).

*Second*, because Plaintiff failed to elicit testimony from Dr. Wollaston that a stronger warning would have changed his prescribing decision, she cannot meet her burden of proof under California's proximate cause standard. *Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 991 (C.D. Cal. 2001) (*Motus I*), *aff'd*, 358 F.3d 659 (9th Cir. 2004) (*Motus II*). Faced with these facts, Plaintiff attempts to rewrite the proximate cause standard, mounting a frontal attack on the learned intermediary doctrine itself. But Plaintiff's arguments cannot be reconciled with decades of California law that the duty of a pharmaceutical manufacturer to warn about the risks of a prescription medicine "runs to the physician, not to the patient." *Carlin v. Super. Ct.*, 920 P.2d 1347, 1354 (Cal. 1996). The same doctrine renders the prescribing doctor the dispositive decisionmaker in the proximate cause calculus. *Motus*, 196 F. Supp. 2d at 991.

Summary judgment is also appropriate on Plaintiff's punitive damages claims. Plaintiff fails to produce the "clear and convincing" evidence of fraud required for a reasonable jury to support a punitive damages claim. Instead, Plaintiff engages in

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  strained misinterpretation of a few innocuous Lilly documents to argue that

2  Cymbalta's discontinuation a warning  – a warning that a federal court has twice held

3  legally adequate– is, in fact, fraudulent.  This claim does not withstand scrutiny.

## ARGUMENT

## I.  Plaintiff Cannot Demonstrate Proximate Cause

To establish causation, Plaintiff must show that Lilly's Cymbalta discontinuation warning was legally inadequate, and that this inadequacy was a "substantial factor" in causing Plaintiff's injury.  The "substantial factor" standard "generally produces the same result as does the 'but for' rule of causation which states that a defendant's conduct is the cause of the injury if the injury would not have occurred 'but for' that conduct." *Rutherford v. Owens-Illinois Inc.*, 941 P.2d 1203, 1214 (Cal. 1997).  For two distinct reasons Plaintiff cannot make this showing, and summary judgment is appropriate.[1]

### A.  Dr. Wollaston independently understood Cymbalta's discontinuation risks and advised Plaintiff about the importance of tapered discontinuation.

Summary judgment is appropriate where the prescribing physician knew the relevant risks based on experience, training, and independent research. *Huntman*, 1998 U.S. Dist. LEXIS 13431 at *17, 27.  Where "plaintiff's physician already knew of the [alleged] danger," then "no harm could have been caused by failure to warn of a risk already known." *Rosburg*, 181 Cal. App. at 735.  Plaintiff tacitly concedes these points, but makes a two-pronged attempt to distract from Dr. Wollaston's clear and relevant testimony about his experience and knowledge.  First, Plaintiff suggests – without support – that a physician's independent knowledge is sufficient only if the physician recalls exhaustive and detailed data about the "true frequency, severity, and

---

[1] Plaintiff's Proposed Facts, filed concurrently with their Opposition to Defendant's Motion for Summary Judgment, proposes 119 "facts," many of which are either irrelevant to the arguments raised in Lilly's Motion for Summary Judgment, or are pure argument.

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

duration" of the relevant symptoms."  (Pl. Opp. at 7).  Second, Plaintiff attempts to distract from Dr. Wollaston's testimony about his understanding of the relevant risks by focusing on a handful of his irrelevant, speculative responses to Plaintiff's leading questions about what "should" be included in the Cymbalta label.  Both approaches are unavailing.

The record is clear:  Dr. Wollaston had significant and independent understanding of Cymbalta's discontinuation risks when he prescribed the medication for Plaintiff.  Cymbalta was "something that [he] used commonly" and in a "significant amount" with fibromyalgia patients such as Plaintiff, and it was "near the top of the list" of medications he prescribed. (Paley Decl. Ex. 8, Wollaston Dep. at 34:8-10, 94:6-8, 94:25 - 95:1).  In addition to prescribing and managing patients on Cymbalta, Dr. Wollaston helped patients stop taking Cymbalta. (*Id. at* 105:22 - 106:1).  He was well aware of the symptoms patients experienced at discontinuation, explaining that some reported feeling "generally unwell, being light-headed, dizzy, having an electrical shock sensation, headaches" during their discontinuation periods. (*Id.* at 106:6-11).  To supplement his clinical experience, Dr. Wollaston also reviewed literature addressing discontinuation symptoms.  (*Id.* at 111:12 - 112:2).  He understood that discontinuation symptoms were common when patients stopped taking antidepressants, and he advised patients to taper the dosage, rather than abruptly discontinue the medication.  (*Id.* at 75:21 - 76:5).  Dr. Wollaston even advised Plaintiff about the importance of tapered discontinuation before she began taking Cymbalta.  (*Id.* at 75:25 - 76:5).  In fact, Plaintiff recalled this conversation with Dr. Wollaston vividly, explaining that "[h]e said, 'Don't -- don't just stop taking it. We'll come up with a schedule.'" (Paley Decl. Ex. 15, E. Hexum Dep. at 224:17-18).  "I remember him saying I'd feel really sick [if I abruptly discontinued Cymbalta].  He said it's not -- it won't be good." (*Id.* at 224:25 - 225:2).[2]  Coupling

---

[2] When Plaintiff decided to stop taking Cymbalta she sought assistance from Dr. Ami Ben-Artzi, although the record suggests she was ultimately not fully compliant with

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  this counsel with her own alleged review of the Cymbalta labeling, Plaintiff testified

2  explicitly that she understood the risk of discontinuation symptoms if she stopped

3  Cymbalta therapy: "*Q.* [Y]ou understood that the symptoms described in that warning

4  were a possibility when you came off the medicine?        *A.* Yes."  *Id.* at 251:2-5.

5        Plaintiff cannot dispute the depth of Dr. Wollaston's experience with Cymbalta

6  and his clear understanding that patients risked experiencing discontinuation

7  symptoms when they stopped taking the medicine.  Instead, she suggests a new and

8  unsupported standard for what constitutes adequate independent knowledge: that the

9  prescriber must know the *precise frequency* at which clinical trial patients experienced

10  discontinuation symptoms.  (Pl. Opp. at 7, stating that Dr. Wollaston did not know

11  that "44 to 50 percent" of abrupt discontinuation clinical trial patients experienced

12  discontinuation symptoms).  Plaintiff cites no legal authority for this proposition, and

13  no such authority exists – for good reason.  Few doctors will have encyclopedic recall

14  of clinical trial data, nor is such information required for a physician to be a

15  knowledgeable and capable practitioner. Indeed, another federal court in related

16  Cymbalta litigation has ruled that the independent knowledge of the plaintiff's

17  prescriber was sufficient to break the proximate cause chain, even in the absence of

18  testimony by the prescriber that she independently knew the specific clinical trial data

19  at issue.  *See McDowell v. Lilly*, --- F. Supp. 3d ---, 2014 U.S. Dist. LEXIS 157819,

20  *39-40 (S.D.N.Y. Nov. 6, 2014) ("The Plaintiff seeks to distinguish [another

21  Cymbalta discontinuation case] by noting that the . . . prescribing physician in [that

22  case] had independent knowledge of the extent of Cymbalta's 44-50% withdrawal

23  symptom occurrence rate. . . .  Here [the prescriber] testified that she had knowledge

24  _____

25  Dr. Ben-Artzi's instructions.    According to Plaintiff's testimony, during her

26  discontinuation period, she opened her Cymbalta capsules to consume partial doses.
    (Paley Decl. Ex. 3, E. Hexum Dep. at 293:18-23). Dr. Ben-Artzi disclaimed any role

27  in this decision, explaining that he "would not advise patients to interfere with the
    integrity of the packaging or delivery mechanisms of medications." (Paley Decl. Ex.

28  10, Ben-Artzi Dep. at 115:8 - 116:7).

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

of the risks of abrupt discontinuation independent of the information provided by Eli Lilly. . . .  even under Plaintiff's theory, the Defendant did not proximately cause the Plaintiff's injuries and is relieved of liability."); 2015 U.S. Dist. LEXIS 23445 (S.D.N.Y. February 26, 2015) (denying motion for reconsideration).  Dr. Wollaston, likewise, "already knew of the [alleged dangers]" thus "no harm could have been caused by failure to warn of a risk already known." *Rosburg*, 181 Cal. App. 3d  at 735.

To contest Dr. Wollaston's unequivocal testimony concerning his independent understanding of the risk of Cymbalta discontinuation symptoms, Plaintiff chiefly relies on Dr. Wollaston's testimony about what "should" be included in the Cymbalta label.  (Pl. Opp. 8-9).  But Plaintiff points the Court to no authority supporting the proposition that testimony on what "should" have been included in a prescription medicine label is sufficient to overcome a prescribing physician's longstanding, independent awareness of a given risk.  To the contrary, the entire independent knowledge prong under California proximate cause law presupposes a plaintiff's ability to raise a critique of the labeling, but applies the common-sense principal that where a prescribing independently understands a risk regardless of what the label says, "no harm could have been caused by failure to warn[.]" *Rosburg*, 181 Cal. App. at 735.  Dr. Wollaston's independent awareness of Cymbalta's discontinuation risk thus provides a stand-alone basis for granting summary judgment here.

**B.  Because Plaintiff failed to elicit testimony from Dr. Wollaston that a stronger label would have changed his prescribing decision, she cannot meet her burden of proof on proximate cause.**

Plaintiff cannot escape the fact that Dr. Wollaston ***did not testify*** that he would have changed his decision to prescribe Cymbalta for Plaintiff if provided with the precise warning Plaintiff contends was missing from the Cymbalta label:

> ***Q.*** Given your experience and your training and given Ms. Hexum's presentation with her symptoms in February of 2012, and the other possible options for her as a patient with fibromyalgia, if

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the prescribing information for Cymbalta had said just what it said today that we've looked over except it also said, 'In the clinical trials for the medicine, discontinuation symptoms occurred in at least some patients 44.3 percent of the time while symptoms occurred for patients on placebo 22.9 percent of the time,' would that have impacted your decision to prescribe the medicine to Ms. Hexum?

. . .

**A. I don't know.** I think it would as I stated previously be part of a discussion about the medication options for the condition insomuch as if it was really that common to develop adverse effects despite the tapering of the drug, then that may be part of a discussion. **But I honestly don't know** and I haven't seen this data before or know how accurate is it but if it was the case, I think that would be part of my discussion with them about the difficulty of getting off the drug.

**Q.** But it would not have changed your ultimate decision to prescribe the drug

. . .

**A.** Again, **I don't know**. . . .

(Paley Decl. Ex. 8, Wollaston Dep. at 116:17- 117:20) (emphasis added).

Plaintiff attempts to sidestep the clear imperative of California's product liability law that that summary judgment is warranted where there is "**no evidence** that any of the plaintiff's treating [physicians] **would have altered their decision to prescribe** [the medication] to plaintiff had a different warning been provided[.]" *In re: Zyprexa Prods. Liab. Litig. (Neal v. Eli Lilly & Co.)*, 2009 U.S. Dist. LEXIS 57218, at *59 (E.D.N.Y. June 22, 2009) (applying California law) (emphasis added), *aff'd*, 394 F. App'x 823, 825 (2d Cir. 2010).  *See also Colville v. Pharmacia & Upjohn Co.*, 565 F. Supp. 2d 1314, 1322 (N.D. Fla. 2008) (holding that Plaintiff must prove failure to warn doctor was the proximate cause of injury: "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.") (applying Florida law) (citations omitted).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    Even viewed in the light most favorable to Plaintiffs, there is simply "no evidence"
2    that Dr. Wollaston "would have altered [his] decision to prescribe" Cymbalta for
3    Plaintiff if given a different warning.  This failure of proof is a second, independent
4    basis for granting summary judgment.

5        Plaintiff's alternative argument – that if Dr. Wollaston had received Plaintiff's
6    preferred warning, it might have influenced what he shared with patients when
7    prescribing Cymbalta, thus prompting Plaintiff to refuse Cymbalta – stands
8    California's Learned Intermediary doctrine on its head.  Under California law, the
9    central inquiry is not what the physician would have shared with the patient if
10   provided a different warning, but instead whether that different warning would have
11   altered the physician's prescribing decision in the first instance. The seminal *Motus*
12   cases are clear: plaintiffs bear the burden of demonstrating that "the additional
13   nondisclosed risk was sufficiently high that it ***would have changed the treating***
14   ***physician's decision to prescribe the product for the plaintiff***." *Motus I* at 995-96
15   (emphasis added).  Plaintiff's attempt to rewrite California's proximate cause standard
16   must be rejected.

17
18              **(i)    Under California law, the learned intermediary doctrine**
                        **focuses on the prescriber's decision.**

19       Plaintiff argues that "if a proper warning would have altered the patient's
20   decision to take the medication, irrespective of whether the warning would have
21   affected the prescriber's decision, causation *can* be established." (Pl. Opp. at 15)
22   (emphasis original).  Under Plaintiff's proposed standard, "evidence that the stronger
23   warning would have caused the plaintiff to refuse the medication is sufficient to create
24   a triable issue of fact." (*Id.* at 16).  As Lilly previously argued in its reply brief
25   supporting its motion for summary judgment in the *Herrera* case (Case 2:13-cv-
26   02702-SVW-MAN, Docket No. 134), this argument is a frontal attack on the learned
27   intermediary doctrine, and it cannot be squared with decades of California
28   jurisprudence.

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

The Court in *Sanchez v. Boston Scientific Corp.* squarely rejected Plaintiff's misguided interpretation of California law, explaining that "[i]t does not withstand scrutiny to say that the learned intermediary doctrine suddenly becomes inapplicable when a plaintiff alleges that warnings are inadequate." --- F. Supp. 2d ----, 2014 WL 4059214, *10 (S.D.W.Va. Aug. 18, 2014) (applying California law). In *Sanchez*, the Plaintiff alleged that inadequate warnings proximately caused the injuries she sustained after having a pelvic mesh implant and argued that the learned intermediary doctrine was inapplicable where the plaintiff alleged that a manufacturer failed to adequately warn the doctor of the device's risks. *Id*. at *2. The Court categorically rejected Sanchez's argument, explaining that "[i]f the learned intermediary doctrine became inapplicable when a plaintiff alleged that warnings were inadequate, the doctrine would never operate in California. Plaintiffs could simply plead around the doctrine by alleging inadequate warnings – which they must necessarily do to state a claim for failure to warn." *Id.* at *4.

Plaintiff's heavy reliance on non-precedential decisions applying other states' laws exposes the weakness of her position. *Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 528 (6th Cir. 2014), applying Tennessee law, specifically cautions against arguing that its holding should be applied outside the state: "Not only are these cases enormously fact-specific and fact-intensive, they are state-specific: the same set of facts that could get a plaintiff to the jury in one jurisdiction could very well result in summary judgment for the drug manufacturer in another. Woe to the party in a failure-to-warn case who thinks that cases from other jurisdictions will guarantee victory in her own." There, the Court anticipated that the Tennessee Supreme Court would adopt the same approach to causation in failure-to-warn cases as it had done with informed consent cases. *Id*. at 532. Such a holding is inapplicable here. *In re Aredia and Zometa Prods. Liab. Litig.*, 2009 WL 2513555 (M.D. Tenn. Aug. 13, 2009) interprets Rhode Island law and denied summary judgment after finding "an issue of fact as to what the oncologist knew[,]" in addition to complicating questions

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

regarding the choices of other care providers.  *Id.* at *2.  *Guenther v. Novartis Pharm. Corp.*, 990 F. Supp. 2d 1299 (M.D. Fla. 2014) and *Kirchman v. Novartis Pharm. Corp.*, 2014 WL 2158519 (M.D. Fla. May 23, 2014) apply Florida law.  *Bowles v. Novartis Pharm. Corp.*, 2013 WL 5297257 at *11 (S.D. Ohio, Sept. 19, 2013), which applies Ohio law, involved the testimony of a prescriber who stated he *would have* followed alternate guidelines affecting "duration of treatment," possibly changing the course of therapy.  There is no comparable testimony from Dr. Wollaston.

Plaintiff also cites *Gilliland v. Novartis Pharm. Corp.*, 34 F. Supp. 3d 960 (S.D. Iowa 2014), which applies Iowa law.  Reliance in *Gilliland* is inapposite, as it expressly disagrees with the "position shared by many courts throughout the country" – including California's established position – that only the prescription decision matters.  *Id.* at 970; *see Motus I*, 196 F. Supp. 2d at 997.  Anticipating that Lilly would cite *Motus* for this uncontroversial proposition, Plaintiff claims that *Motus* "only applies **when the patient is no longer alive** to offer any testimony about what they would have done."  (Pl. Opp. at 18) (emphasis added).  Plaintiff provides no support for this novel interpretation, which is demonstrably false.  *See, e.g., Gaghan¸* 2014 N.J. Super. Unpub. LEXIS 1895, *31, 38  (concluding in a case with a living plaintiff that "California law focuses on the **prescribing decision** of the doctor as the learned intermediary" and reversing the trial court's decision, which incorrectly "viewed the proximate cause question as tied to the patient's decision to accept or decline Accutane[.]") (emphasis added).  *See also In re Zyprexa*, 2009 U.S. Dist. LEXIS 57218 at *59-62 (applying the *Motus I* holding on prescribing decision in a case with a living plaintiff) (applying California law), *aff'd*, 394 F. App'x 823, 825 (2d Cir. 2010).

While Plaintiff argues that the Court should expand its inquiry to reach the physician's discussion with the patient, *Motus* demands otherwise. As the *Motus* court explained at length, the "the kind of information [doctors] would pass on to [their] patients" raises no genuine issue of fact:

- 9 -

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Plaintiff's lawyer did ask Dr. Trostler: "If you had been told that Zoloft can cause an increased risk in suicide during the first few weeks of drug treatment, *is that the kind of information you would pass on to your patients?" Dr. Trostler responded, "Yes."*

*Plaintiff argues that this response creates a genuine issue as to whether Dr. Trostler would have changed his behavior had Pfizer provided adequate warnings.*

*The Court does not agree.* Given that this case is about the sufficiency of the warnings accompanying Zoloft, *the appropriate question would have been: "If Zoloft's package insert had contained a warning that Zoloft can cause an increased risk in suicide during the first few weeks of drug treatment, would you have prescribed Zoloft to Mr. Motus?"*

*Motus I* at 997, *aff'd* 358 F.3d 659 (9th Cir. 2004) (emphasis added).

Under California's proximate cause standard enunciated by *Motus I* and affirmed in the Ninth Circuit, the relevant "change in behavior" is plainly the *prescribing decision*, *not* any theoretical shift in what physicians tell their patients. This standard has been reinforced time and again by courts applying California law. For instance, in *Gaghan v. Hoffman-LaRoche Inc.,* the Court explicitly considered Plaintiff's argument here: whether the prescriber's warnings to plaintiff were of any legal relevance. They were not. Where "[t]he question of law is whether the ***conduct of the doctor*** that would be altered by a stronger warning is limited to the doctor's prescribing decision or, as the trial court concluded here, also includes the doctor's decision to provide a stronger warning to the patient. . . . *[W]e conclude that California law focuses on the prescribing decision of the doctor as the learned intermediary*." *Gaghan*, 2014 N.J. Super. Unpub. LEXIS 1895, *38 (App. Div. Aug. 4, 2014) (per curiam) (applying California law) (emphasis added).  *See also In re Zyprexa*, 2009 U.S. Dist. LEXIS 57218 at *59-62 (granting summary judgment where there was "no evidence that any of plaintiff's treating psychiatrists would have ***altered their decision to prescribe*** Zyprexa to plaintiff had a different warning been provided

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- 10 -

1    by Lilly.") (applying California law) (emphasis added), *aff'd*, 394 F. App'x 823, 825

2    (2d Cir. 2010).

3        The few decisions Plaintiff cites to the contrary fail to advance her case.

4    *Stanley v. Novartis Pharm. Corp.*, 11 F. Supp. 3d 987 (C.D. Cal. 2014) and  *Georges*

5    *v. Novartis Pharm. Corp.*, 2012 WL 9083365 (C.D. Cal. Nov. 2, 2012) are both cases

6    in which the doctors had no knowledge of the relevant risks when treating the

7    plaintiffs.  These are irreconcilably different from Dr. Wollaston's situation, where he

8    not only knew of the risk of discontinuation symptoms, but warned patients

9    accordingly.  In both *Stanley* and *Georges*, the courts noted that the doctors had since

10   changed their "prescribing" practices as it related to cautioning about future dental

11   procedures, a unique situation with no parallel here.  *Georges*, 2012 WL at *5 ("Dr.

12   Waisman has testified that *his prescription process* has changed . . . .") (emphasis

13   added); *Stanley*, 11 F. Supp. 3d at 1003 ("Dr. Molina testified that he would *now*

14   *prescribe the drug in a more conservative manner*, which would include dental

15   monitoring.") (emphasis added).   *In re Aredia and Zometa Products Liability*

16   *Litigation*, 2009 WL 2497692, *2 (M.D. Tenn. 2009) is similarly inapposite, as

17   Plaintiff's physician testified that he *would have* changed his prescribing practices

18   (plaintiff's physician would have enacted a "change in how he prepares the patient for

19   the drug, things like *having teeth checked out by a dentist* and *having a dentist*

20   *consider an x-ray* to make sure the teeth are in good repair.")  Finally, in *Hill v.*

21   *Novartis Pharm. Corp.*, 2012 WL 6004161 (E.D. Cal. Nov. 30, 2012), summary

22   judgment was denied because "the Court [had] already found genuine issues of

23   material fact as to whether the risk of osteonecrosis of the jaw was known or

24   knowable to Defendant before Plaintiff was prescribed Zometa and whether

25   Defendant's subsequent labeling changes were adequate." *Id.* at *4. Even if the

26   language Plaintiff extracts from *Hill* were not pure dicta, the case's fact pattern makes

27   it incomparable with Dr. Wollaston's situation. In *Hill*, the Court's statement that

28   "more adequate warnings *would* have changed Plaintiff's course of medical treatment"

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 11 -

were based on the findings that the prescriber had *no knowledge* of the relevant risk (osteonecrosis of the jaw from bisphosphonate use) when he prescribed the medicine for the Plaintiff.  *Id*. at 4.  Here, Dr. Wollaston was not only aware of the risk of discontinuation symptoms with Cymbalta, but he also warned patients – *including Plaintiff* – of that risk.

Finally, Plaintiff's argument that "in light of Mrs. Hexum's background, Dr. Wollaston would ***not*** have prescribed Cymbalta had he known the risks" (Pl. Opp. at 12) is incorrect, as it relies on a twisted misreading of the cited testimony.  Plaintiff supports this claim based on Dr. Wollaston's testimony that if Plaintiff returned to him "tomorrow" (the day after the 2014 deposition) having experienced alleged Cymbalta discontinuation symptoms in 2013, he would "probably not" prescribe Cymbalta for her "again":

> ***Q.***  You had a question or an issue as to what Ms. Hexum actually went through.  And I will represent for the record that she went through what we allege are withdrawal symptoms relating to Cymbalta.  The physician who followed her after you, a doctor by the name of Benardsi, reported in his treatment notes that she experienced some very serious and extensive withdrawal symptoms including seizures, including paresthesia and brain zaps so wanted you to know and be assured this is not an insignificant thing that we are claiming in this lawsuit.  These symptoms actually happened to her and in the context of having gone through them, I think what I heard you say is that, in retrospect, you would certainly want to find and seek out a product that would help avoid that kind of a thing for her;  is that fair?
>
> . . . [objection omitted]. . .
>
> ***THE WITNESS:*** What I think I stated was that if -- ***the question that I had been asked before was if it was her coming back tomorrow*** and with the same history and examination that I saw her with in 2012 tomorrow, ***would I do the same thing in prescribing her Cymbalta again*** and I think my answer to that was: ***Given this problem that she obviously had which I didn't know what it was, I probably would not prescribe Cymbalta for her given her poor background at that time***.

(Paley Decl. Ex. 8, Wollaston Dep. at 125:21 - 127:2) (emphasis added).

Prompted by a plainly objectionable speech by counsel, this testimony lacked any foundation in Dr. Wollaston's actual knowledge of Plaintiff's condition and

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

treatment.   Indeed, Dr. Wollaston testified that he had "no idea" and "no understanding" of what symptoms Plaintiff alleges in this lawsuit, and counsel for Plaintiff presented no record evidence on which Dr. Wollaston could have offered an informed view of Plaintiff's claimed injuries.  As a consequence, Dr. Wollaston could not properly offer testimony on how he might have changed his prescribing decision based solely upon counsel's account of Plaintiff's injuries asserted in this lawsuit.  And Plaintiff may not invoke that testimony to avoid summary judgment.  *See Haggerty v. Federal Ins. Co.*, 32 F. App'x 845, 848-49 (9th Cir. 2012) (ruling that district court correctly declined to consider on summary judgment a declaration submitted by party as evidence creating factual dispute where declarant lacked foundation for assertions in declaration).  To the contrary, this testimony does not overcome Dr. Wollaston's explicit testimony that he still prescribes Cymbalta to appropriate patients and has "[q]uite a few" patients on the medicine (Wollaston Dep. 95:2-9); that he believes that he would have prescribed Cymbalta again to Plaintiff if she had presented to him with the same "several year history of chronic panic pain, having been referred by her primary care doctor and in light of the other possible treatment options," (Paley Decl. Ex. 8, Wollaston Dep. 116:6-13); or, most critically, that he simply did not know if he would change his prescribing decision if confronted with the additional clinical trial data that Plaintiff insists should have been included in the Cymbalta label.

### (ii)   Plaintiff cannot satisfy her burden even under the patient-centric standard she advances.

Finally, even if California law supported the Plaintiff's attempt to eviscerate the learned intermediary doctrine – and it most assuredly does not – the factual record does not support Plaintiff's claim that "Mrs. Hexum would have refused Cymbalta treatment if Lilly had put a stronger warning on the label."  (Pl. Opp. at 16).  Plaintiff's testimony was much more tentative:

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

*Q.* And if this warning that you have testified you saw said that if the number had been forty percent instead of one percent, what would you have done differently?

*A. I don't know* if I would have taken the medicine.  I think I *probably would have exhausted every other treatment beforehand.*

. . .

*Q.* **And if you'd exhausted your other options and your symptoms had remained the same, would you have taken the medication?**

*[objection omitted]*

*A.*  I'm guessing. I mean, I can't guess. *I have no idea*. You're asking me to -- to guess what future things I would have done. I can't do that.

*Q.* Well, you've just told me that if it said 40 percent, that you would have exhausted all your options.

*A.* Definitely.

*Q.* So I'm just asking you a variation on what I think I just heard you say.  *Would you have taken the medicine if the number had been 40 percent instead of one percent?*

*[objection omitted]*

*A.*  I don't feel comfortable assuming. I'm not -- *I can't guess.* No.

*Q.* If some day down the road your lawyer asks you some version of that question, are you going to be able to answer it?

*A.* If my lawyer asked me that question?

*Q.* Yeah?

*A*. That says if -- would I have taken it?

*Q.* Yeah.

*A. I'll tell him the same thing. I have no idea. Like, I -- I have no idea if I would have taken that pill if, you know, the ten other things that I could have done wouldn't have worked.* I don't -- I don't feel comfortable guessing.

*Q.* That's not a question you could ever answer under oath?

*[objection omitted]*

*A:* No. I don't think so. Not honestly.

Paley Decl. Ex. 15, E. Hexum Dep. at 244:15 - 246:18 (emphasis added).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- 14 -
REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

1    Thus, Plaintiff's unequivocal testimony confirmed that she could not offer the

2  proof necessary to satisfy her burden even under the legally ungrounded framework

3  she advances here.

4    Because Plaintiff has failed to "set forth specific facts showing showing that

5  there is a genuine issue for trial" regarding proximate cause, summary judgment is

6  appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986).

7

8  **II.    Plaintiff does not provide "clear and convincing" evidence of fraud to support her punitive damages claim.**

9

10    When challenged on summary judgment, Plaintiff has an obligation to come

11  forward with actual evidence upon a which a reasonable jury could find that Lilly

12  acted with the requisite level of intent to take the disfavored step of awarding punitive

13  damages.  When a reasonable jury could not find the plaintiff's evidence to be "clear

14  and convincing proof of malice, fraud or oppression[,]" summary judgment on

15  punitive damages is appropriate.  *Ferretti v. Pfizer Inc.*, 2013 WL 140088, at *23

16  (N.D. Cal. Jan. 10, 2013).  The "clear and convincing evidence" standard is a high

17  one, and "any evidence submitted [by Plaintiffs] in response to a motion for summary

18  adjudication must necessarily meet that standard."  *Eisenberg v. Permanente Medical*

19  *Group*, 855 F. Supp. 2d 1002, 1016 (N.D. Cal. 2012), *citing Basich v. Allstate Ins.*

20  *Co.,* 87 Cal.App.4th 1112 (Cal. App. 2 Dist., 2001).  Plaintiff's proffered evidence

21  falls far short of the "clear and convincing proof" required to maintain a punitive

22  damages claim past the summary judgment stage.[3]

23    Rather than presenting clear and convincing evidence of fraud, Plaintiff's

24  punitive damages argument is an exercise in misinterpreting documents and

25  testimony.  The core of Plaintiff's argument – that "several months before Cymbalta

26

---

27  [3] In her Opposition, Plaintiff incorporates the arguments on punitive damages from the summary judgment briefing in *Herrera v. Lilly*, Case 2:13-cv-02702-SVW-MAN,

28  Docket No. 134.  Lilly does the same.

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

was approved the problem with Cymbalta's withdrawal risk profile was raised among Lilly executives" (Pl. Opp. at 20-21, *citing* Pl. SJ Ex 44) – does nothing to advance her case, and the 2003 Perahia email chain (Pl. SJ Ex. 44) cited to support this argument is a puzzling choice to buttress a fraud claim.  In this document, Dr. Perahia and several colleagues discuss the best approach to developing and sharing data about the risk of Cymbalta discontinuation symptoms.  Discontinuation data had already been shared with and evaluated by the FDA, when Lilly included clinical trial data on discontinuation-emergent adverse events with its the New Drug Application for Cymbalta in 2001 (Paley Decl. Ex. 19, November 12, 2001 Original Application NDA 21-427 at CYM-00725746).   The FDA's August 2002 "Medical Review #3" acknowledged this discontinuation data.[4]  (Paley Decl. Ex. 16).  With the FDA already informed, Dr. Perahia suggested that Lilly take two additional steps: "[w]rite up our data and get it published," and "[c]onsider running a trial which might add to the evidence on how best to manage stopping the drug[.]"  (Pl. SJ Ex. 44).

Lilly proactively followed the two-pronged approach Dr. Perahia suggested.  In 2005, Dr. Perahia and several colleagues joined with an external expert to publish a study of discontinuation data from nine early clinical trials in the *Journal of Affective Disorders* – a full seven years before Plaintiff ever took Cymbalta.  Plaintiff's dismissive characterization of this publication as a "backwater journal" (Pl. Opp. 21) betrays her unfounded advocacy.  As Dr. Perahia explained, the *Journal* is "a very well-recognized, respected journal" that has been "ranked somewhere in the region of 16th out of 500 in terms of its global impact and citations."  (Paley Decl. Ex. 17, Perahia Dep. at 174:1-5).  In addition to publishing early trial results, Lilly continued conducting numerous clinical trials that tracked and analyzed rates of discontinuation symptoms as patients tapered off Cymbalta.  Ultimately, Lilly elected not to provide highly detailed discontinuation guidelines in the Cymbalta label, because it became

---

[4] *Available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021427 _s000_Cymbalta_Medr_P2.pdf.

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

apparent that tapering was an individualized process best managed by a patient's physician. As Dr. Perahia explained, "from a patient safety perspective, it might be argued that it isn't appropriate for Lilly to make specific tapering suggestions for patients given the number of different variables involved in such clinical care. . . .  I think there's a potential risk with offering too much specific detail that it may not be appropriate for an individual patient. . . .   Too much specific detail may be problematic for physicians to interpret." (*Id.* at 228:7 - 229:6). Indeed, the FDA has always approved the tapering language in the Cymbalta label. The 2003 Perahia email (Pl. SJ Ex. 44) simply does not support  Plaintiff's fraud allegations.

Indeed, none of the sales documents Plaintiff cites to support her punitive damages claim even hint of wrongdoing, let alone provide clear and convincing evidence of fraudulent activity.   Documents noting perceived strengths and weaknesses of other antidepressants (Pl. SJ Ex. 38), and documents that suggest sales representative should be able to explain to a doctor "what her patients can expect and how she should take people off of the medication if needed." (Pl. SJ Ex. 40), simply are not evidence of fraudulent activity, and Plaintiff's claim that they show Lilly "trained its sales force to disparage Paxil" (Pl. Opp. at 21) has no factual basis. Moreover, these documents demonstrate that antidepressant discontinuation symptoms were a well-known and commonly-addressed phenomenon in the medical field long before Plaintiff started taking Cymbalta in 2012.

Plaintiff's efforts to rely on European labeling and related discussions (Pl. Opp. at 22) are similarly ineffectual.  Plaintiff  points to no evidence of "deceptive effort" to conceal data from FDA, and indeed – as noted above – Lilly shared its discontinuation data with FDA long before Cymbalta's approval.  Plaintiff relies solely on the fact that the US and European labels are different.  But different wording in different countries is commonplace and driven by the differing regulatory regimes.  Courts routinely find foreign labeling irrelevant in considering the appropriateness of U.S. labeling – as the *McDowell* court recently opined in considering the precise argument presented here:

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

"The mere existence of a differently structured written European label does not establish that the U.S. label is insufficient, misleading, or legally inadequate, nor is foreign regulatory action even appropriate as a subject of expert testimony in pharmaceutical cases." *McDowell v. Lilly*, 2015 U.S. Dist. LEXIS 23445 at 12 (S.D.N.Y. February 26, 2015); *see also In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, *965 (D. Minn. 2009) ("The Court finds that any discussion of foreign regulatory actions is irrelevant to the current litigation and should therefore be excluded."); *In re Seroquel Prods. Liab. Litig.,* 2009 U.S. Dist. LEXIS 124798, *285 (M.D. Fla. Jan 30, 2009) ("The foreign Seroquel labels and the foreign regulatory actions have no relevance to Plaintiffs' main case."), *motion to vacate denied, Burns v. AstraZeneca Pharms. LP,* 601 F. Supp. 2d 1313, 1314 (M.D. Fla. 2009).[5]

Finally, *Johnson & Johnson v. Superior Court*, 192 Cal. App. 4th 757 (2011) (cited at Pl. Opp. 23), is easily distinguishable and does not support Plaintiff's punitive damages argument. There, in assessing whether summary judgment was appropriate for a punitive damages claim regarding the consumer warning provided for an over-the-counter medication, the court found that there was "arguably a significant difference between a general warning of 'allergic reaction' versus a description of the specific symptoms associated with the rare *but potentially fatal* conditions at issue here." *Id.* at 768 (emphasis added). When the FDA "finally did focus specifically on the issues of the OTC labeling regarding warnings about

---

[5] Contrary to her claim, Dr. Sharon Hoog's testimony does not support Plaintiff's punitive damages argument. Dr. Hoog explained that "[l]abels often diverge based on the interests of the reviewers and other, perhaps, cultural or healthcare delivery system factors and so on. But it's not unusual for different countries to want to emphasize different things. . . . when we propose labeling, it is essentially the same. And in the discussions with the individual regulatory agencies, it -- it sort of morphs, it evolves into language that emphasizes what they prefer to emphasize. ***And it's not that someone is hiding any information from one or the other.*** But when we propose the same thing to different reviewers, they -- they have different preferences and -- and different interests. And although I wasn't involved in this, clearly this is -- this is what the European reviewers were more interested in. ***It wasn't that this information wasn't available about the individual symptoms. It was. But that's what the FDA cared about, and this is apparently what the Europeans cared about[.]***" (Pl. SJ Ex. 29 at 182:8 - 183:13) (emphasis added).

[relevant side effects], it concluded that warnings were needed." *Id.* at 767. Additionally, "triable issues of fact remain as to whether petitioners' provision of the information was done in a manner that would *sufficiently call it to the FDA's attention*, particularly given the *severity of the harm* which can result from [the adverse event]." *Id.* at 768 (emphasis added).

No similar evidence supports a Plaintiff's claim for punitive damages in this case. As shown above, relevant discontinuation data was provided to the FDA, the FDA acknowledged its receipt and analyzed the data, and Lilly published the data in a peer-reviewed journal. Moreover, Lilly's label warned about the risk of discontinuation symptoms and *actually listed* approximately a dozen symptoms reported during clinical trials. Cymbalta's label reflects discontinuation data from Cymbalta's clinical trials, which were submitted and duly considered by FDA in evaluating Cymbalta's approval, and which follow a standard format consistent with established FDA regulations and procedures. *See* 21 C.F.R. §201.57(c)(7) (instructing manufacturers to "list the adverse reactions identified in clinical trials that occurred *at or above a specified rate appropriate to the safety database*.") (emphasis added); *see also* Paley Decl. Ex. 18, FDA Guidance for Industry: *Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products – Content and Format* (Jan. 2006).

Plaintiff's claim that Lilly's Cymbalta label is fraudulent because it does not contain specific discontinuation statistics has been soundly rejected two times by Judge Sweet in the parallel *McDowell v. Eli Lilly & Co.* case in the federal court in New York. *See* --- F. Supp. 3d ---, 2014 U.S. Dist. LEXIS 157819 (S.D.N.Y. Nov. 6, 2014) (granting summary judgment on the adequacy of the warning in Cymbalta's label); 2015 U.S. Dist. LEXIS 23445 (S.D.N.Y. February 26, 2015) (denying motion for reconsideration of adequacy ruling). In finding the Cymbalta label adequate, Judge Sweet explained that courts "have refused to graft onto the adequacy standard a requirement that a package insert must include specific adverse event frequencies."

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- 19 -

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

*McDowell,* 2014 U.S. Dist. LEXIS at *33; *see also Hurley v. Lederle Labs.*, 651 F. Supp. 993, 1002 (E.D. Tex. 1986) ("The plaintiff cites no authority for the proposition that a drug manufacturer has a duty to warn . . . of the rate of adverse reactions."); *Ames v. Apothecon Inc.*, 431 F. Supp. 2d 566, 573 (D. Md. 2006) (finding a medication warning legally adequate and noting that "plaintiffs were unable to cite a single case in which a court has found a label to be defective because the incidence rate was not described"); *Calabrese v. Trenton State College*, 162 N.J. Super. 145, 153-54 (N.J. Super. App. Div. 1978), *aff'd*, 413 A.2d 315 (N.J. 1980) (per curiam) ("Plaintiff's central argument that a drug manufacturer's warnings must, as a matter of law, include . . . statistical information concerning the incidence of the condition for which the drug can be used, is without merit."); *Ackley v. Wyeth Labs*, 919 F.2d 397, 405 (6th Cir. 1990) (affirming summary judgment on warning adequacy where the risk in question "was included in the list of possible adverse reactions in the warning insert" but did not include an event frequency, as plaintiff alleged it should).

Because Plaintiff has not come forward with "evidence from which a jury might return a verdict in their favor" on punitive damages, summary judgment is required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## **CONCLUSION**

For the reasons set forth above, Lilly's motion for summary judgment should be granted, and judgment should be entered in Lilly's favor as to all claims.

DATED:  March 30, 2015

/s/ David E. Stanley
David E. Stanley
REED SMITH LLP

Michael X Imbroscio (*pro hac vice*)
Phyllis A. Jones (*pro hac vice*)
Kathleen E. Paley (*pro hac vice*)
COVINGTON & BURLING LLP

Attorneys for Defendant
ELI LILLY AND COMPANY

REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(A)