David E. Stanley (SBN 144025)
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071-1514
Telephone: (213) 457-8000
Facsimile: (213) 457-8080
dstanley@reedsmith.com

Michael X Imbroscio *(pro hac vice)*
Paul W. Schmidt *(pro hac vice)*
Phyllis A. Jones *(pro hac vice)*
Kathleen E. Paley *(pro hac vice)*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5868
Facsimile: (202) 778-5868
mimbroscio@cov.com
pajones@cov.com
kpaley@cov.com

Attorneys for Defendant
Eli Lilly and Company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN HEXUM & NICK HEXUM,<br><br>    Plaintiffs,<br><br>    v.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>    Defendant.<br><br>* * *<br><br>CLAUDIA HERRERA and PETER LOWRY,<br><br>    Plaintiffs,<br><br>    v.<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>    Defendant. | Case No.: 2:13-cv-2701 SVW-MANx<br><br>Case No.: 2:13-cv-2702 SVW-MANx<br><br>**DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date:      June 11, 2015<br>Time:      1:30 PM<br>Location:  Courtroom 6<br>Judge:     Hon. Stephen V. Wilson |

## ARGUMENT

At the June 1 conference, the Court permitted supplemental briefing from the parties on Lilly's pending summary judgment motions. The Court did so based upon Plaintiffs' counsel's representation that "recently revealed" information produced in later-filed Cymbalta suits would be relevant to the issues presented in the motions before this Court. *See* Jones Decl., Ex. A (Hearing Tr., June 1, 2015), at 9. Plaintiffs' supplemental briefing does not bear this claim out.

First, Plaintiffs' supplemental opposition demonstrates that almost none of the discovery upon which Plaintiffs rely is in fact new. Rather, fifteen of the sixteen documents Plaintiffs attached as exhibits were produced prior to the close of discovery in these matters, in December 2014. *See* Jones Decl., at ¶¶ 2-17. And, the post-December deposition testimony cited by Plaintiffs — which could have been obtained in these cases had Plaintiffs sought to depose the readily identifiable witnesses whose testimony they now cite — does nothing more than reiterate the substance of those previously produced documents.

Second, even if Plaintiffs' supplemental opposition relied on "new" discovery — and Lilly maintains that it does not — Plaintiffs have not created a genuine dispute of material fact on the proximate cause record on which Lilly's motions are based. As laid out in Lilly's motions, Plaintiffs' prescribing physicians were independently aware of the risk of antidepressant discontinuation symptoms and denied or refused to endorse the proposition that a different discontinuation warning in the Cymbalta label would have changed their decision to prescribe the medicine to Plaintiffs. This breaks any possible chain of causation that an allegedly inadequate warning led to Plaintiffs' injuries. *See* Mot. for Summ. J., *Herrera v. Eli Lilly and Co.*, Dkt. #120, at 2 ("Herrera MSJ"); Mot. for Summ. J., *Hexum v. Eli Lilly and Co.*, Dkt. #129, at 2 ("Hexum MSJ"). The correspondence and testimony cited in Plaintiffs' supplemental opposition does not disturb this record. Indeed, Plaintiffs make no effort in their

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

-1-
Case Nos.: 2:13-cv-2701 SVW-MANx and 2:13-cv-2702 SVW-MANx
DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

supplemental briefing to explain — as the Court directed that they must — "what about the additional information [is] relevant, if at all, to the motions here." Jones Decl., Ex. A (Hearing Tr., June 1, 2015), at 6.

And, finally, Plaintiffs fail to present the documents and testimony they cite in the proper context. Plaintiffs' filing essentially states that Lilly never included in the label information from (a) one clinical trial where results from the tapered discontinuation group were not statistically significant as compared to the abrupt discontinuation group and (b) data from two head-to-head trials comparing Cymbalta and Effexor that utilized an elicited checklist. But, Plaintiffs ignore the fact that Lilly's collective clinical trial data demonstrates that tapering minimizes the risk of discontinuation emergent adverse events for Cymbalta patients and that the label is therefore accurate and reasonable in recommending gradual tapering.[1] *See* Jones Decl., Ex. C (2009 Multi-Study Analysis), at 1478, 1506. In fact, Plaintiffs concede in a footnote buried at the end of their brief the soundness of the precise guidance provided in the Cymbalta discontinuation warning: that patients discontinuing antidepressant therapy "should, wherever possible, taper." *See* Pls.' Suppl. Opp'n at 8, n. 4.

Plaintiffs' apparent strategy to delay indefinitely the resolution of these cases should end. These cases are ripe for decision, and the Court should grant summary judgment in Lilly's favor.

## I. The Information Cited by Plaintiffs is Not New.

The entire premise of the Plaintiffs' request to submit a supplemental brief was that

---

[1] As noted in Lilly's motions, Lilly firmly believes that the discontinuation warning is adequate as a matter of law. Indeed, another court has so held. *See McDowell v. Eli Lilly & Co.*, --- F. Supp. 3d ---, 2014 U.S. Dist. LEXIS 157819 (S.D.N.Y. Nov. 6, 2014), *reconsideration denied*, No. 13 Civ. 3786, 2015 U.S. Dist. LEXIS 23445 (S.D.N.Y. Feb. 25, 2015). But, Lilly did not move for summary judgment on adequacy grounds because there was a more straightforward and immediate basis for granting summary judgment — the undisputed factual record demonstrating that Plaintiffs cannot show a causal link between any alleged deficiency in the Cymbalta label and their claimed injuries.

they acquired new discovery in separate actions in the Eastern District of Virginia. This premise is belied by the evidence cited in Plaintiffs' brief.

In support of their supplemental filing, Plaintiffs attach sixteen exhibits, including thirteen e-mails, and refer to testimony from two Lilly witnesses in separate actions. However, fifteen of the sixteen exhibits, and twelve of the thirteen e-mails, were produced in these actions before the summary judgment briefing took place. In fact, nine of these sixteen exhibits are trial exhibits for the Herrera matter. *See* Jones Decl., at ¶¶ 2-17. And five of the thirteen e-mail chains include Dr. Perahia, a Lilly employee who Plaintiffs deposed in these cases. The only data upon which they seek to rely that Plaintiffs did not have prior to the close of discovery is one e-mail, produced in April 2015 discussing elicited scales (which Plaintiffs subsequently designated as a Herrera joint trial exhibit), and testimony from two Lilly witnesses describing the documents to which Plaintiffs had access prior to the close of discovery in these matters. The two witnesses, including a 30(b)(6) witness on Lilly's clinical trials, were readily identifiable in these cases, but Plaintiffs did not request their depositions.

The only document that was not part of the discovery in these cases is Exhibit 16 to Plaintiffs' supplemental opposition. In this e-mail chain, Dr. Detke, a former Lilly employee later deposed in separate actions, states that an elicited scale was not used during the discontinuation periods of the early phase Cymbalta clinical trials and that, in his opinion, elicited scales result in higher rates of reported symptoms that will end up in the label. *See* Pls.' Suppl. Opp'n, at 7. This document was produced to Plaintiffs in April 2015 in separate actions when Plaintiffs requested Dr. Detke's documents and sought to depose him. *See* Jones Decl., at ¶ 17. Plaintiffs could have made the same requests here, but did not. And, notably, Plaintiffs fail to present Dr. Detke's testimony regarding this document to the Court — presumably because his

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

-3-
Case Nos.: 2:13-cv-2701 SVW-MANx and 2:13-cv-2702 SVW-MANx
DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

testimony is antithetical to their argument that elicited scales result in more accurate results. Dr. Detke testified to the contrary:

> Q: And then there's another e-mail apparently from you about a minute later, and you say, quote, if you use an elicited scale, you'll see higher rates, period, this will, will in all caps, end up in the label, period. Mike, end quote. Do you see that?
>
> A: Yes.
>
> Q: Why did you -- what did you mean by "this will end up in the label"?
>
> A: I think what I had in mind when I wrote this e-mail is that, as I mentioned earlier, if you use an elicited scale, you're very likely to get higher rates, and some of those may be false positives. But if you see false positives in a -- if you see positive signals in a trial, false or otherwise, they are likely to end up in the label, and we don't want false information in the label.

Jones Decl., Ex. B, at 100:10-25.

The deposition excerpts cited by Plaintiffs also cannot constitute "new" evidence because each instance of excerpted testimony merely describes Plaintiffs' Exhibits 1-15 or other clinical trial data that Plaintiffs were provided prior to the close of discovery in the instant matters. *See* Pls.' Suppl. Opp'n, at 2 (Detke describing Pls.' Ex. 5); *id.* at 3 (Wohlreich 30(b)(6) testimony "confirming" the results contained within Pls.' Ex. 5); *id.* at 4 (Detke describing Pls.' Ex. 6); *id.* at 5 (Wohlreich 30(b)(6) and fact-witness testimony stating same as Pls.' Ex. 7); *id.* (Detke confirming statement in Pls.' Ex. 7); *id.* at 5 n.3 (Detke describing pooled analysis that is Herrera JTX 414, which was produced to Plaintiffs in July 2013);[2] *id.* at 7 (Wohlreich 30(b)(6) testimony describing Exs. 12 & 14); *id.* at 8 (Wohlreich 30(b)(6) testimony describing Ex. 15).

---

[2] Jones Decl., Ex. C (2009 Multi-Study Analysis) & ¶ 20.

1  Overall, barring Plaintiffs' Exhibit 16, which Plaintiffs did not put into context,
2 none of the information cited by Plaintiffs is actually new.  And, although available to
3 Plaintiffs throughout the briefing periods on Lilly's motions for summary judgment,
4 Plaintiffs did not include the information in their original filings.  Indeed, it would not
5 have been appropriate to do so because they are demonstrably irrelevant to the heart of
6 the briefing — whether Drs. Braunstein and Wollaston would have changed their
7 decision to prescribe Cymbalta if the discontinuation warning in the label would have
8 been different.

## II. The Evidence Cited By Plaintiffs Has No Relevance To The Proximate Cause Record.

As explained more fully in Lilly's motions for summary judgment, which Lilly fully incorporates here, Drs. Braunstein and Wollaston were acutely aware that adverse events could result from discontinuing antidepressant therapy — including from discontinuing Cymbalta.  This uncontested record, of which Plaintiffs make no mention in their opposition, is fatal to Plaintiffs' claims.

Dr. Braunstein first became aware of the risk of antidepressant discontinuation syndrome during his medical training in the 1980s and 1990s due to daily exposure to antidepressants.  *See* Herrera MSJ, at 4.  Once he was in private practice, he continued to see patients experiencing "some combination" of discontinuation symptoms "with virtually every anti-depressant" he had ever prescribed.  *Id.* at 11.  These specifically included the symptoms identified in the Cymbalta label — dysphoric mood, irritability, agitation, dizziness, paresthesias, anxiety, confusion, headache, lethargy, emotional lability, insomnia, hypomania, tinnitus, and seizures.  *Id.* at 4.  "I was aware that these symptoms were common," he explained, and that "there were a significant number of people that did have unpleasant withdrawal symptoms."  *Id.* at 12.  Yet, as part of his practice, he regularly prescribed Cymbalta to over 100 patients over time

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

because, according to him, it is "one of the most effective best anti-depressants" on the market. *Id.* at 5.

Like Dr. Braunstein, Dr. Wollaston, too, was familiar with antidepressant discontinuation syndrome. By the time he had prescribed Cymbalta to Mrs. Hexum, he had had more than a decade of experience prescribing antidepressants. *See* Hexum MSJ, at 4. He understood, from his experience and a review of the literature, that discontinuation symptoms included things like "[d]izziness, nausea, headache, paresthesia, fatigue, vomiting, irritability, insomnia, diarrhea, anxiety and hyperhidrosis," as well as queasiness and lightheadedness. *See id.* at 10. Still, "both then and now for most patients with fibromyalgia," he stated, he "would consider either an SNRI including Cymbalta or one of [another class of medicine]." *Id.* at 11.

There is no evidence in the record, and Plaintiffs cite none, that additional data from one clinical trial regarding abrupt versus tapered discontinuation or two head-to-head clinical trials without a placebo arm would have impacted the prescribing decisions of Drs. Braunstein or Wollaston. Both prescribers were aware that the conventional medical wisdom is to taper patients off antidepressant therapy in lieu of abrupt cessation. They thus regularly advised patients to taper Cymbalta independent of what was instructed in the label. *See* Herrera MSJ, at 7-8; Hexum MSJ, at 4, 11.

More specifically, Dr. Braunstein testified that he learned about the practice of tapering patients off of antidepressants as part of his basic training in medical school and described that clinical wisdom as "basic psychopharmacology 101." Herrera MSJ, at 8. Dr. Braunstein additionally testified that, sometimes, in patient-specific circumstances, abrupt cessation of antidepressant therapy can be appropriate. In each case, the decision is driven by the needs of the patient. *See* Decl. of K. Paley in Supp. of Herrera MSJ, Ex. 2 (Braunstein Dep.), Dkt. #120-5, at 131:23 - 132:22. This further buttresses the proposition that any modification to the tapering language in the label would not have affected Dr. Braunstein's decisions.

Dr. Wollaston similarly testified that he learned about the practice of tapering patients off of antidepressants as part of his fellowship. *See* Hexum MSJ, at 4. Dr. Wollaston further testified that he understood that the advisability of tapering applied to the entire class of antidepressants. *See id.* at 11.

Because the prescribers were independently aware of the risk of discontinuation syndrome, and of the conventional practice to taper within the class of antidepressants, any alleged inadequacy in the label (or any of the evidence presented in Plaintiffs' supplemental opposition, for that matter) could not have led to Plaintiffs' injuries. Thus, the Plaintiffs cannot carry their burden to establish proximate cause — this independent awareness breaks the chain of causation. *See, e.g.*, *McDowell*, 2014 U.S. Dist. LEXIS 157819, at *40, *48; *Carnes v. Eli Lilly & Co.*, 2013 U.S. Dist. LEXIS 176201, at *19 (D.S.C. Dec. 16, 2013). Nothing cited by Plaintiffs in their Opposition undermines this explicit record testimony.[3] Summary judgment should be granted.

### III. Plaintiffs Misstate the Substance of the Information Presented In Their Supplemental Briefing.

If the Court views the substance of the documents as relevant to the pending motions for summary judgment — and Lilly maintains that they are not — Lilly respectfully requests that the Court examine them in their proper context. When viewed in light of the overall evidence, rather than as sound bites offered in isolation, Lilly maintains that they do not raise a genuine issue of material fact.

- Tapering: Plaintiffs point to one clinical trial where there was no statistically significant difference in the frequency of patients experiencing discontinuation symptoms in the abrupt and taper groups. Because of this study, Plaintiffs criticize Lilly for not including in their label "that

---

[3] Further, Drs. Braunstein and Wollaston were specifically asked by Lilly's counsel during their depositions if including a frequency rate in the discontinuation warning would have changed their original prescribing decision. Neither doctor testified that it would have. This is another basis to grant summary judgment in favor of Lilly. *See* Herrera MSJ, at 13-15; Hexum MSJ, at 12-16.

[discontinuation] symptoms were not mitigated by tapering." Pls.' Suppl. Opp'n, at 8. Yet, buried in a footnote, Plaintiffs concede that tapering "is not bad" and that "patients should, wherever possible, taper." *Id.* at 8, n.4. Thus, Plaintiffs effectively agree that the label, which states that "[a] gradual reduction in the dose rather than abrupt cessation is recommended whenever possible" is accurate, appropriate, and reasonable.[4]

- Elicited Checklist[5]: Plaintiffs point to two clinical trials comparing Cymbalta and Effexor that calculated discontinuation data by using an elicited checklist. Rather than connecting this data to the actual content of the Cymbalta label, Plaintiffs suggest (without an explicit argument in their brief) that this data should have appeared in the label without recognizing that the Cymbalta label is drawn from aggregated safety and efficacy data of

---

[4] There are several more problems with Plaintiffs' presentation of the abrupt versus tapering data. First, it is a mischaracterization to say that the results of the specific study showed that "there was no difference between tapering or abruptly discontinuing within the Cymbalta treatment groups." Pls.' Suppl. Opp'n, at 2. Rather, as is evident by the excerpt following Plaintiffs' misstatement, the difference among the abrupt and taper groups was apparent, just "no[t] statistically significant" given the size of the sample in that single trial. *Id.* at 3. Second, the proposition that Lilly should modify its safety warnings based on the findings of one individual trial, rather than on the entirety of its clinical experience and safety database, is a simplistic and impractical position. Third, Plaintiffs themselves acknowledge that a subsequent pooled analysis comparing tapered and abrupt discontinuation demonstrated a modest benefit to tapering of about three percent. *See id.* at 5 n.3; *see also* Jones Decl., Ex. C (2009 Multi-Study Analysis), at 1478, 1506. In fact, that pooled analysis resulted in DEAEs among patients taking Cymbalta in clinical trials at overall rates far below the 44% Plaintiffs assert should have been in the label. *See* Jones Decl., Ex. C (2009 Multi-Study Analysis), at 1478. Finally, Plaintiffs' implicit suggestion that the Cymbalta label promises negligible or no discontinuation symptoms if patients taper the medicine is contrary to the plain text of the label, which recommends tapering without stating that tapering eliminates discontinuation symptoms and warns physicians to monitor patients, even patients who are tapered off of Cymbalta.

[5] The elicited checklist issue has nothing to do with abrupt versus tapered discontinuation. It is thus not apparent how this issue even responds to the Court's request regarding the issue of tapering that was directed to be the topic for discussion in Plaintiffs' supplemental submission. *See* Jones Decl., Ex. A (Hearing Tr., June 1, 2015), at 14.

-8-
Case Nos.: 2:13-cv-2701 SVW-MANx and 2:13-cv-2702 SVW-MANx
DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

systematic trials *comparing Cymbalta to placebo.* As Dr. Braunstein recognized in examining the data outlined in the 2005 Perahia article, a comparison to placebo "gives you a true picture of what's happening." Herrera MSJ, at 7. Without a control, placebo group using the same elicited scale, then, the comparison is one of apples to oranges, and the resulting percentage cannot be compared to other systematically-derived expressions of frequency.

Thus, rather than presenting genuine issues of material fact, Plaintiffs merely supplied immaterial information that has no bearing on the issues raised in Lilly's motions for summary judgment.

## CONCLUSION

Plaintiffs' supplemental submission presents no new information material to Lilly's pending motions for summary judgment. For the foregoing reasons and those included in Lilly's original briefing, the Court should grant summary judgment.

DATED: June 8, 2015						Respectfully Submitted,

/s/ David E. Stanley
David E. Stanley
REED SMITH LLP

Michael X Imbroscio (*pro hac vice*)
Phyllis A. Jones (*pro hac vice*)
Kathleen E. Paley (*pro hac vice*)
COVINGTON & BURLING LLP

Attorneys for Defendant
ELI LILLY AND COMPANY

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

-9-
Case Nos.: 2:13-cv-2701 SVW-MANx and 2:13-cv-2702 SVW-MANx
DEFENDANT'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT